## NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

## CIRCLE BINDERY, INC., Respondent.

### No. 75–1407.

United States Court of Appeals,
First Circuit.

Argued March 1, 1976.
Decided May 28, 1976.

---

448

Elliott Moore, Deputy Associate Gen., Washington, D.C., with whom John S. Irving, Jr., Gen. Counsel, Washington, D.C., was on brief, for petitioner.

Julius Kirle, Boston, Mass., for respondent.

Before COFFIN, Chief Judge, ALDRICH and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

The National Labor Relations Board brings this petition for enforcement of an order issued against respondent Circle Bindery (Circle). Circle was charged with having committed an unfair labor practice in violation of sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 151 et seq.,[1] by discharging an employee, Peter Verrochi. The Board's administrative law judge ruled after hearing that the discharge was not an unfair labor practice,

1. Section 8, 29 U.S.C. § 158, provides in part, "(a) It shall be an unfair labor practice for an employer—
    (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section [7];

.    .        .    .

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization .    .    . ."
Section 7, 29 U.S.C. § 157, provides,

but the Board found a violation of the Act and issued the order now before us.[2]

The evidence before the administrative law judge showed as follows: Verrochi, a folder operator by trade, was a member of the Organizing Committee of the Graphic Arts International Union, Local 16–B, AFL–CIO (the Union), and an officer of the Union's Executive Board. On or about November 19, 1973, he was laid off temporarily, for economic reasons, by his full-time employer, a bindery called Trembly Trade. The president of the Union, George Carlsen, advised him to seek employment with Circle, a non-union shop, during the layoff period, in part so that he could try to organize Circle's workers. Verrochi had worked for Circle on several occasions in the past and his union membership was known there. He contacted Herbert Martell, president of Circle, and was hired on a temporary basis, although he also discussed, without reaching any agreement, the possibility of permanent employment with Circle.[3]

Verrochi began work on Monday, November 26. While performing his regular duties on Monday, he saw copies of a booklet being bound pursuant to a contract between Circle and a printing firm, Excelsior Press, Inc. (Excelsior). He saw on the cover page a union label, or "bug", with the number "74" alongside. The bug signified that the booklets had been produced by union labor and the "74" was Excelsior's identifying number. Excelsior was authorized to use this bug under a licensing agreement with the Allied Printing Trades Council (the Council), which is composed of local printing unions, including the Union.[4] Both from the terms of the agreement and evidence of local practice, it can be gathered that the agreement prohibited Excelsior from subcontracting the binding work on any printed material marked with the bug to a non-union bindery, i. e., a bindery whose employees were not covered by collective-bargaining agreements and members of Council-affiliated unions.[5] The

"Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section [8(a)(3)]."

2. The Board's order required Circle to cease and desist from unfair labor practices, offer Verrochi reinstatement, give him backpay, and post an appropriate notice.

3. By the time of the hearing, Verrochi had been rehired by Trembly Trade. However, because he and Martell had discussed permanent employment, the Board found it unclear whether Verrochi had been hired by Circle temporarily or whether he had been offered permanent employment. In ordering reinstatement and backpay, the Board left open for determination at the compliance stage of the proceedings the precise terms and scope of the reinstatement and backpay orders.

4. Excelsior had collective-bargaining agreements with both the Typographical Union and the Pressman's Union, both of which are affiliated with the Council. It had no agreement with the Union directly and none of its employees were represented by the Union.

5. The licensing agreement provided in part,

"That the licensee [Excelsior] in consideration of the license to the use of the label of the INTERNATIONAL ALLIED PRINTING TRADES ASSOCIATION, licensor, hereby represents that he now employs and hereby proposes during the continuance of this license to employ in the printing, mailing, binding and production of all printed matter, photo-engravings, electro-types, stero-types and all other illustrative matter entering into printing and printing products, members in good standing of unions which are now and hereafter may become affiliated with the licensor, and to faithfully carry out all of his contracts or agreements of employment with such unions. The licensee shall not loan or sell the type, plates or matrices used or produced in its office to any other office unless such office complies in every respect with the terms and conditions set forth in this label license. The license herein granted shall be non-transferable and non-assignable."

George Carlsen, chairman of the Counsel's Label Committee, testified that the bug indicated "that all work processed on any jobs bearing the Union label, would have to be . .

agreement did not bar Excelsior from subcontracting non-labelled work to a non-union bindery. However, Excelsior had sent this bug-marked job to Circle, a non-union shop having neither collective bargaining agreements with nor majority employee representation by any Council-affiliated union.

Determining that something was amiss, Verrochi that afternoon took several copies of the booklet without Circle's permission. He left a copy at the Council office on a desk shared by Carlsen and Mel Rawson, vice-president of the Union and business agent of the Council, with a note explaining that the binding was being done at Circle. Verrochi did not discuss the matter with anyone at the Council office at that time. Carlsen later told Rawson to "leave it alone"; he did not want to jeopardize Verrochi's job and the Union's foothold in Circle's work force. Rawson, however, said that he would "[take] it upon himself to pursue the matter." The following afternoon he received a call from Verrochi who had also learned that Carlsen did not intend to take any action. Verrochi told Rawson how he felt—

> " 'here I am being laid off work and am in a non-union shop where this job is, and if this job were where it was supposed to be, it could possibly mean that myself and other people that were laid off could be working on jobs like this in a union shop, enjoying the pay rates and the benefits.' "

Verrochi denied at the hearing, however, that he wanted Rawson actually to pull the job from Circle. Rawson agreed with Verrochi that some action should be taken, but because of Carlsen's position he made no promises.

The following morning Rawson called Felicani and demanded that he pull the job from Circle, regardless of the stage of production, since Excelsior had violated its licensing agreement by sending it there. Felicani consented and in turn told Martell

to return the booklets. (The work was then within an hour of completion and in fact was completed.) Felicani let on that the Union had ordered him to pull the job and queried whether Martell was in trouble with the Union. Earlier that morning, Martell had learned that Verrochi had been seen taking some Excelsior booklets out of the shop. Putting two and two together, Martell concluded that Verrochi was responsible for the call from Felicani. Upset about losing the job and concerned about not being paid for it, he confronted Verrochi and fired him. Martell testified saying to Verrochi at the time,

> " 'you big mugg, you took books out of my shop, you showed them to the Union, and you have created a problem between my customer and myself, you are sabotaging my company, so you are all done.' "

As Verrochi described this confrontation,

> " 'I asked [Martell] what he was talking about, he said big mouth union man is what I am talking about. I can't have you people coming around here disrupting my organization and talking to my people. Furthermore I just received a phone call to stop processing on this job.' "

Later, in response to an attempt by Felicani to persuade him to rehire Verrochi, Martell said that he expected his employees to be more loyal than to remove work from the shop before it had been finished and to show it to the Union, and he refused to reinstate Verrochi.

During his brief employment at Circle, Verrochi managed to speak with a few employees, three in all, about organizing the shop—one on Tuesday and two on Wednesday morning, before the firing incident—although without much success.

The administrative law judge found that Verrochi had urged the withdrawal of the binding job from Circle and was discharged for that reason. Although General Counsel

---

handled by union personnel [from beginning to end]". Arthur Felicani, the president of Excelsior, testified that it was the "unwritten law" to have work bearing the bug bound in union shops.

for the Board contended that Verrochi was also discharged on account of his organizing activity, the judge found that was not a factor. Citing *NLRB v. Local No. 122, International Brotherhood of Electrical Workers (Jefferson Standard Broadcasting Co.),* 346 U.S. 464, 476 n. 12, 74 S.Ct. 172, 98 L.Ed. 195 (1953), he concluded that the protection of the act

> "does not extend so far as to entitle Verrochi 'to injure or destroy his employer's business' where his purpose was to secure the employment opportunities of other employer's employees as opposed and in effect to the detriment of his own employer's employees [citation omitted]."

The judge accordingly recommended dismissal of the complaint.

The Board disagreed. Verrochi, it found, was fired for two reasons: for his organizing activity and for his part in pulling the Excelsior job. The Board did not explicitly find that Verrochi actually urged that the job be pulled, as did the judge; it said only that Verrochi had protested the misuse of the label and that Rawson had "acted on [his] urgings" in demanding withdrawal. The Board ruled that

> "Verrochi's activities in this regard were directed solely to protecting himself and his fellow members of the Union by preventing misuse of the union label which could undercut the Union's standards

and, accordingly, were concerted and within the protection of the Act."

In so doing, the Board recognized that Verrochi's conduct was inimical to his employer's business, but concluded that it was nevertheless within the protection of the Act.[6]

▉ We turn first to the difference between the findings of the Board and those of the administrative law judge on the reasons for Verrochi's discharge. A discharge is an unfair labor practice only if for a purpose prohibited by the Act, § 8, and not if for a lawful business purpose or "for cause", § 10(c). The administrative law judge found that Verrochi had been fired solely for his part in having the Excelsior job withdrawn from Circle. The Board found, on the other hand, that he was also fired for his organizing activity. For this additional finding of the Board we do not find substantial support in the record as a whole, *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *Frattaroli v. NLRB,* 526 F.2d 1189, 1193 (1st Cir. 1975). We have held that a motive may be given dispositive weight by the Board only if it was dominant or controlling, *e. g., NLRB v. Fibers International Corp.,* 439 F.2d 1311, 1312 & n. 1, 1315 (1st Cir. 1971), and here the evidence is overwhelming that the controlling factor in the discharge was, as the

---

**6.** The Board distinguished *NLRB v. Local No. 1229, International Brotherhood of Electrical Workers (Jefferson Standard Broadcasting Co.),* 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953), on the ground that the workers there, in disparaging their employer's product, were not dealing directly with a labor practice of the company but rather were attacking policies relating to finance and public relations—interests which the attackers were being paid to conserve or develop. The Board went on to say,

> "On the other hand, in the instant case Verrochi's conduct in seeking Excelsior's adherence to union label rules, unlike that of the striking employees in *Jefferson Standard,* was related to his status as a union member and his desire to protect the interests of his fellow members in the industry by insuring, to the extent possible, that work would be directed towards union shops. Admittedly, [Circle] lost business as a result of Verrochi's efforts in this regard. But that loss of busi-

ness was not the result of any disparagement of the merits of [Circle]'s product or of the competence of Excelsior's or [Circle]'s contribution to the product. Rather, as we have seen, it came about because of their invasion of the standards that the Union sought to protect. In this respect, it is no different from the loss of business caused by lawful picketing. *Edir, Inc., d/b/a Wolfie's,* 159 NLRB 686 (1966). Consequently, [Circle]'s business loss is not such an injury for which Verrochi, seeking to promote unionism through proper use of the union label, must be held accountable. To conclude otherwise and deny to Verrochi's conduct the same protection afforded lawful picketing would in our opinion exalt a loss of business over the statutory right of an employee to make common cause with his fellow employees in the protection of a vital union asset, the union label.

administrative law judge found, Verrochi's self-appointed policing of the bug. Martell fired Verrochi shortly after the call from Felicani; Verrochi himself testified that Martell was obviously upset and concerned about the possibility of losing money. Even the remarks which Verrochi attributed to Martell, e. g., about Verrochi's "talking to my people", reflected only a peripheral concern with Verrochi's organizing activity. As the record does not bear an interpretation that Verrochi's organizational activities generally were even a significant factor in his discharge, we hold that the Board erred in basing its finding of an unfair labor practice on that ground.

We are thus left with the question whether Circle's firing of Verrochi for the bug incident was an unfair labor practice. This depends in turn upon whether Verrochi's policing of the bug was "concerted activit[y]" for the purpose of "mutual aid or protection" within section 7. The administrative law judge thought not, because it benefitted only fellow union members, not fellow employees, while at the same time injuring Verrochi's employer.

■ The Board took the different view that while Verrochi's conduct was not aimed at improving conditions for Circle's non-union employees, it was nonetheless within section 7 because directed "solely to protecting himself and his fellow members of the Union by preventing misuse of the union label which could undercut the Union's standards". While the question is close, we think the Board's view must be accepted in this context where the employer's obtaining of the work was a direct violation of its customer's union contract. To be sure, concerted activity for "mutual aid and protection" usually denotes action by an employee in the interest of his fellow

employees. But courts have not limited section 7 to this meaning, see, e. g., Fort Wayne Corrugated Paper Co. v. NLRB, 111 F.2d 869, 873–74 (7th Cir. 1940). Section 7 gives to employees a right, broadly, to "form, join, or assist labor organizations", and section 2(3) defines "employee" as including "any employee, . . . not . . . limited to the employees of a particular employer, unless this subchapter explicitly states otherwise . . . ." Verrochi's activity was aimed at maintaining the integrity of an established union symbol having the purpose of promoting the employment of union members under union conditions, and we think the Board could determine that such activity fell within section 7.

■ It may be true, and we shall assume, that Verrochi pressed matters to the point of causing some harm to his employer's business.[7] Compare Hoover Co. v. NLRB, 191 F.2d 380 (6th Cir. 1951); Edir, Inc., d/b/a Wolfie's, 159 NLRB 686 (1966). The administrative law judge apparently believed that because Verrochi's activity was only for the benefit of other union members, not co-workers, its legitimacy ceased to the extent it injured Verrochi's employer.[8] But concerted activity that is otherwise proper does not lose its protected status simply because prejudicial to the employer. See NLRB v. Peter Cailler Kohler Swiss Chocolates Co., 130 F.2d 503, 506 (2d Cir. 1942) (L. Hand, J.). In determining whether conduct harmful to an employer is within section 7, it may indeed be appropriate to take into account whether the presumed beneficiaries are fellow employees or a more remote class. But this sort of balancing of employer and employee interests, especially in a close case like this, falls within the area of the Board's expertise. Cf. Hudgens v. NLRB, 424 U.S. 507,

7. How great the harm is not clear from the record. There is no indication that Circle was not ultimately paid for the job, which it completed. We may assume that Circle lost the opportunity to bind labelled work for Excelsior in the future, but it had no entitlement to bind labelled work in the first place. There is no claim that Verrochi's conduct interfered or was

meant to interfere with Circle's business relations except as to union labelled material.

8. The administrative law judge assumed that Verrochi was harming his fellow employees because he was harming his employer. But there was no evidence that Verrochi's action had any appreciable adverse effect on his fellow employees at Circle.

521, 96 S.Ct. 1029, 47 L.Ed.2d 196, 44 U.S.L.W. 4281, 4286 (1976). We therefore give considerable weight to the Board's judgment. *Universal Camera Corp. v. NLRB, supra, cited in Frattaroli v. NLRB, supra.* Here the Board evidently saw the lack of direct benefit to fellow employees as counterbalanced by the fact that Verrochi acted as a union member solely to ensure the proper use of the union bug as provided in the customer's contract. He did not attack his employer's business in any other respect. *See Jefferson Standard, supra,* 346 U.S. at 474–75, 74 S.Ct. 172.

We recognize that even activity otherwise protected under section 7 ceases to be protected if conducted in an excessive or indefensible manner, *id.* at 477–78, 74 S.Ct. 172. But the Board found that Verrochi did no more than take several booklets from the shop[9] to the Council office and later tell Rawson that he felt Circle should never have had that job in the first place. He acted within union channels and his protests were confined to a suitable complaint. True, the administrative law judge went further, finding that Verrochi actively urged withdrawal of the job from Circle. But even so, the Board could have concluded that Verrochi did not act indefensibly. The harm Circle sustained was merely to lose work which under Excelsior's union contract it should not have received in the first place. While other means for correcting misuse of the bug were available, e. g., censuring Excelsior, there was testimony that the " 'pulling' action 'generally happens' in these situations", and there is no reason to assume that Circle lost its usual right to be paid under the order for the work it did.[10] Under the circumstances, we think the Board did not exceed its authority.

*Enforcement granted.*

9. It is not contended that the unauthorized taking of the booklets prior to the completion was itself unlawful.

10. The administrative law judge also noted that this method of enforcing the licensing agreement created a possibly serious secondary boycott issue, but in light of his resolution did not

reach that question. We agree with the Board that that issue is not properly before us and so do not consider it, though we have some difficulty understanding the Board's contention that the parties have waived their rights to raise it should they subsequently be before the Board in a proper proceeding.