623 F.2d 808
 104 L.R.R.M. (BNA) 2666, 89 Lab.Cas. P 12,098
 MISERICORDIA HOSPITAL MEDICAL CENTER, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Committee of Interns and Residents and New York State Nurses
Association, Intervenors-Respondents.
 Nos. 885, 1149, Dockets 79-4216, 80-4004.
 United States Court of Appeals,
Second Circuit.
 Argued April 9, 1980.
Decided June 6, 1980.
 
 Frederick T. Shea, New York City (Kelly Drye & Warren, Paul L. Bressan, New York City, of counsel), for petitioner.
 Richard S. Zuckerman, Atty., N.L.R.B., Washington, D.C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Carol A. DeDeo, Atty., N.L.R.B., Washington, D.C., of counsel), for respondent.
 Irwin Geller, New York City (Karen S. Schwartz, New York City, of counsel), for intervenor-respondent Committee of Interns and Residents.
 Harder & Silber, Albany (Richard J. Silber, Albany, on the brief), for intervenor-respondent New York State Nurses Ass'n.
 Before FRIENDLY, FEINBERG and TIMBERS, Circuit Judges.
 FEINBERG, Circuit Judge:
 
 
 1
 Misericordia Hospital Medical Center (the Hospital) petitions for review, and the National Labor Relations Board applies for enforcement, of a Decision and Order of the Board, reported at 246 NLRB No. 57, holding that the Hospital had violated § 8(a)(1) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1), by making statements equating activity protected under § 7 of the Act, 29 U.S.C. § 157, with disloyalty to the Hospital, by threatening to take reprisals against employees who had been involved in the protected activity, and by discharging a head nurse who had been so involved. The Board ordered the Hospital to cease and desist from these unfair labor practices and to reinstate the discharged head nurse. The Hospital argues that the Board's order was improper, both because the activity engaged in by the employees was not protected by § 7 of the Act, and because the head nurse was a supervisor rather than an employee covered by the Act. Since we are not persuaded by either of these arguments, we deny the petition for review and enforce the order of the Board.
 
 I.
 
 2
 At the unfair labor practice hearing, there was evidence of the following: The Joint Commission on Accreditation of Hospitals (JCAH) is an independent corporation that issues certificates of accreditation to hospitals that meet its standards of institutional medical care. Hospitals that satisfy those standards are "deemed" to be in compliance with federal Medicare "Conditions of Participation," and are accordingly eligible for Medicare funds. See 42 U.S.C. § 1395bb. In addition, hospitals that meet the JCAH's standards are "accredited" within the meaning of the governing New York hospital code. 10 NYCRR, Ch. V, Art. 2, Part 405.2(b). The JCAH conducts bi-annual surveys of hospitals to monitor compliance with its standards; to avoid duplication, its surveys are combined with those of the New York State Health Department.
 
 
 3
 In June 1978, the JCAH conducted a survey of the Hospital. Pursuant to JCAH requirements, the Hospital had posted notices in mid-May that announced the survey; the JCAH invited interested parties "including staff of the hospital undergoing survey" to present relevant information at the JCAH's "public information interview" concerning whether accreditation standards were being met. In response to these notices, certain Hospital personnel formed the Ad Hoc Patient Care Committee (the Ad Hoc Committee), and prepared a report cataloguing what they felt to be inadequacies in the operation of the Hospital. Among those who participated was Antoinette Cafaro, a head nurse who was responsible for one of the Hospital's "patient care units."
 
 
 4
 The contract administrator of the Hospital's Committee of Interns and Residents (CIR)[1] presented the Ad Hoc Committee's Report (the Report) at the JCAH's public information interview on June 16. In addition to the survey teams, members of the Hospital administration, heads of Hospital departments, and representatives from the Community Board[2] were also present when the Report was read.[3] The Report listed what the Ad Hoc Committee believed to be "serious deficiencies in the quality of care at Misericordia Hospital." The Committee's criticisms focused on three areas: emergency room and admissions policies; the allegedly inadequate and unsanitary facilities that characterized a number of patient care units, including the unit where Cafaro worked; and nursing staff shortages that had led to "insufficient coverage on many shifts." After listing several miscellaneous criticisms, including the supposed failure of the Hospital's administration to respond to previous reports filed by internal professional committees, the Report closed by stating that the Ad Hoc Committee looked to the JCAH "to exert the necessary pressure to see that these deficiencies are corrected."
 
 
 5
 Dr. Frank Cicero, the Hospital's Chief Executive Officer, prepared a rebuttal to the Report, which he presented at the JCAH's "summation conference" held on June 20. That "conference" was attended by the survey teams, members of the Community Board, and several hundred of the Hospital's employees. In his rebuttal, Dr. Cicero denounced the Report as the "vicious and venal" product of "a selfish few" determined to jeopardize the jobs of "1,100 good, conscientious and hard-working people." He stressed that the Report was unsigned, and called into question the motives of its authors; in this context, he noted that he appended to his reply "a detailed review of this hospital's involvement" with the CIR and with the three nurses in charge of the floors prominently discussed in the Report. Then there occurred what must have been a dramatic scene; Dr. Cicero asked all Hospital personnel attached to the units mentioned in the Report to stand in turn while he answered the Ad Hoc Committee's specific charges. Thereafter, notwithstanding the deficiencies the JCAH found in the Hospital's operations, including some of those mentioned in the Report, the JCAH re-accredited the Hospital.
 
 
 6
 Two days after the JCAH's summation conference, Dr. Cicero held a special meeting to which all of the head nurses were invited, with the specific exception of Cafaro and another head nurse who had contributed to the Report. At that meeting, Dr. Cicero again responded to the Report, and pointed out that certain nurses were absent because of their involvement in its preparation. When asked what he thought should happen to those who had contributed to the Report, Dr. Cicero responded that he thought they should "apologize to their co-workers . . . and . . . resign." If they did not resign voluntarily, he stated, other action would be taken.
 
 
 7
 On June 25, Dr. Cicero called Cafaro to his office and informed her that he was discharging her because "she did not fit in with the short or long range goals of Misericordia Hospital." Cafaro asked whether her discharge had anything to do with her earlier union organizational activity for the New York State Nurses Association (SNA)[4] or with the JCAH presentation. Dr. Cicero's only response was that if Cafaro told him she had nothing to do with those events, he would believe her. When Cafaro then asked why she was being discharged, Dr. Cicero responded, "let's just say our philosophies differ." After Cafaro's discharge, the SNA and the CIR filed charges with the Board. Following an extensive hearing, the Administrative Law Judge (ALJ) found that the Hospital had violated the Act; the Board's Decision and Order affirmed his decision. This action followed.
 
 II.
 
 8
 As the foregoing indicates, there is ample basis for the Board's finding that the Hospital impliedly labelled as "disloyal," and threatened reprisals against, employees who had contributed to the Ad Hoc Committee's Report; Dr. Cicero's statements at the summation conference and at the subsequent nurses' meeting are hardly open to any other interpretation, and the Hospital makes only a perfunctory attempt to argue otherwise. Likewise, the record amply supports the Board's finding that the Hospital discharged Cafaro because of her participation in preparing the Report. The ALJ found implausible the alternative explanations for the discharge tendered by Dr. Cicero at the hearing[5] and was, of course, in the best position to judge the credibility of the witnesses. The Board found no basis in the record for overruling his findings as to credibility, and neither do we. The ALJ's determination is supported by all of the surrounding circumstances: the discharge followed very closely on the heels of the Report, which the Hospital concedes "outraged" Dr. Cicero; the evidence suggests that Dr. Cicero was well aware of Cafaro's contribution to the Report;[6] and he did not state to Cafaro any of the reasons for firing her that he later testified to before the ALJ. The Board could also take into account that although Dr. Cicero told Cafaro that she did not "fit in" with the Hospital's goals, she had received satisfactory or better ratings throughout her 15 years as a Hospital employee. In light of all of the evidence, the Board clearly was justified in concluding that Cafaro was discharged because of her involvement with the Ad Hoc Committee.
 
 
 9
 The Hospital argues, however, that even if these findings were correct, the Board nonetheless erred in concluding that the Hospital's actions violated § 8 of the Act, since contributing to the Report did not constitute protected activity within the contemplation of § 7 of the Act. We disagree. That section establishes the right of employees "to engage in . . . concerted activities for the purpose of collective bargaining or other mutual aid or protection . . . ."[7] The Supreme Court has recently rejected the view that employees lose their § 7 protection "when they seek to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship." Eastex, Inc. v. NLRB, 437 U.S. 556, 565, 98 S.Ct. 2505, 2512, 57 L.Ed.2d 428 (1978). The Court noted in Eastex that § 7 repeatedly has been interpreted as protecting employees who "seek to improve working conditions through resort to administrative and judicial forums" or through "appeals to legislators." Id. at 566, 98 S.Ct. at 2512 (citing cases). While recognizing that at some point the relationship between the activity and the employees' interests might become "so attenuated" that § 7 no longer applied, the Court held that it is for the Board in "the first instance" to consider the precise boundaries of the "mutual aid and protection" clause of § 7. Id. at 568.
 
 
 10
 In this case, the Board held that participation in preparing the Report came within the ambit of § 7. The Board reasoned that since the Report dealt with, among other concerns, nursing staff shortages, it raised issues directly related to employee working conditions. The Board also stressed that the Report dealt with issues of sanitation that were of concern to hospital staff, as well as to patients; accordingly, the Board held, the Report was analogous to complaints concerning safety violations made to appropriate governmental bodies. Finally, the Board concluded that the Report did not constitute a "disloyal" statement like that found to fall outside of the protection of § 7 in NLRB v. Local 1229, International Brotherhood of Electrical Workers (Jefferson Standard), 346 U.S. 464, 74 S.Ct. 172, 98 L.Ed. 195 (1953).
 
 
 11
 We cannot say that the Board erred in determining that preparation of the Report constituted § 7 activity. The record supports the Board's finding that the Report raised issues that related not only to patient welfare but to the working conditions of the employees; indeed, in the health care field such issues often appear to be inextricably intertwined. See, e. g., Community Hospital of Roanoke Valley, Inc. v. NLRB, 538 F.2d 607, 610 (4th Cir. 1976) (holding protected a television interview in which a nurse complained of hospital staff shortages, and suggested that they were related to low pay); Reading Hospital and Medical Center, 226 NLRB 611 (1976), enforced, No. 76- 2496, 96 LRRM 2512 (3rd Cir. Sept. 16, 1977) (holding protected threat by operating room nurse to complain to newspaper that proposed elimination of surgical residency program might require performance of surgical duties beyond her competence). The Hospital contends, however, that the Report cannot be considered an attempt to improve working conditions, since the JCAH's "sole function" is to monitor a hospital's quality of patient care; thus, the Hospital argues, the JCAH is not concerned with the lot of employees.
 
 
 12
 We believe that the Hospital reads the mandate of the JCAH too narrowly. According to the Foreword to its Accreditation Manual for Hospitals (1978), the JCAH is dedicated "to the development of national standards of structure, function, staffing and procedure for hospitals" (emphasis added); while "(a) ll of these standards are directed towards the provision and maintenance of quality patient care," id., they obviously also directly affect the working conditions of hospital employees. For example, the JCAH's "principle" with regard to functional safety and sanitation two of the central concerns of the Ad Hoc Committee's Report states that "(t)he hospital shall be functionally safe and sanitary for patients, hospital staff, and visitors." Id. at 21 (emphasis added). Similarly, with regard to nursing services another focus of the Report the JCAH Standard I states: "(t)here shall . . . be a sufficient number of duly licensed registered nurses on duty at all times . . . ." Id. at 95. Clearly, then, the JCAH deals with issues that affect employee working conditions as well as patient care; significantly, the JCAH requested the comments of all interested parties, including the staff of the hospital.
 
 
 13
 The JCAH thus provided an appropriate forum in which to seek to improve Hospital conditions affecting both staff and patients. As the Hospital itself emphasizes, a JCAH survey determines whether a hospital will receive federal Medicare funds and state accreditation; at least in part then, both federal and state laws entrust the JCAH with the responsibility of enforcing health care standards for hospitals. Under the circumstances, we hold that the Board was correct in concluding that the Report was similar to protected complaints made to an appropriate administrative agency. See, e. g., Socony Mobil Oil Co., Inc. v. NLRB, 357 F.2d 662 (2d Cir. 1966) (complaint to Coast Guard); Walls Manufacturing Co. v. NLRB, 321 F.2d 753 (D.C.Cir.), cert. denied, 375 U.S. 923, 84 S.Ct. 265, 11 L.Ed.2d 166 (1963) (complaint to state health department); B & P Motor Express, Inc., 230 NLRB 653 (1977) (threat of complaint to Department of Transportation ): Alleluia Cushion Co., Inc., 221 NLRB 999 (1975) (complaint to OSHA).
 
 
 14
 We also reject appellant's further argument that in any event the Report constituted a "disloyal" attack within the meaning of Electrical Workers, supra. In Electrical Workers, the Supreme Court held that an employer could discharge "for cause" employees who distributed a handbill that attacked the financial and public relations policies of the company without mentioning the firm's labor practices or working conditions. See 346 U.S. at 476, 74 S.Ct. at 178. But that case is not authority for the proposition that a statement critical of an employer automatically provides grounds for discharging the speaker. As the Court later made clear, the rationale of Electrical Workers was that the leaflets distributed there demonstrated a disloyalty to the employer "unnecessary to carry on the workers' legitimate concerted activities." NLRB v. Washington Aluminum Co., 370 U.S. 9, 17, 82 S.Ct. 1099, 1104, 8 L.Ed.2d 1099 (1962) (emphasis added). In contrast, the statements here were a necessary part of the Ad Hoc Committee's concerted activity. See also Community Hospital, supra, 538 F.2d at 610 (distinguishing Electrical Workers on ground that statements in question "directly related to protected concerted activity then in progress").[8] Unlike the handbills in Electrical Workers, the Report did raise issues involving working conditions and appears to have been a responsible attempt to remedy perceived deficiencies in the Hospital, at least some of which the JCAH found actually existed.[9] See, e. g., Socony Mobil Oil, supra, 357 F.2d at 663-64 (good faith complaint protected even though some allegations false); Walls Manufacturing, supra, 321 F.2d at 754 (same); Golden Day Schools, Inc., 236 NLRB 1292 (1978) (flyers did not have "malicious tone" necessary to invoke Electrical Workers ). The facts here differ significantly from those in the cases relied on by the Hospital.[10] Finally, whereas the flyers in Electrical Workers were directed to the public at large, the Report was presented to an entity charged with monitoring the Hospital's compliance with health care standards.[11]
 
 
 15
 Accordingly, we hold that the Report was not stripped of § 7 protection simply because it was critical of the Hospital. As the First Circuit has aptly stated, "concerted activity that is otherwise proper does not lose its protected status simply because (it is) prejudicial to the employer." NLRB v. Circle Bindery, Inc., 536 F.2d 447, 452 (1st Cir. 1976). To hold otherwise would be to render meaningless the rights guaranteed to employees by § 7.
 
 III.
 
 16
 Appellant also asserts that Cafaro's discharge could not have violated § 8(a) (1) even if preparation of the Report was protected activity, since she was a supervisor within the definition of § 2(11) of the Act, 29 U.S.C. § 152(11). That section, which is reprinted in the margin,[12] defines a "supervisor" as an individual "having authority in the interest of the employer" to take or "effectively to recommend" any of twelve enumerated personnel actions with regard to other employees, if "the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." Supervisors are not "employees" within the meaning of the Act, see § 2(3), 29 U.S.C. § 152(3), and therefore they are not entitled to the protections the Act accords to employees. See, e. g., NLRB v. Metropolitan Life Insurance Co., 405 F.2d 1169, 1172 (2d Cir. 1968). While the Hospital does not contest the Board's characterization of Cafaro as a "professional employee," see § 2(12), 29 U.S.C. § 152(12),[13] it points out that the Supreme Court recently has stated that " . . . professionals, like other employees, may be exempted from coverage under the Act's exclusion for 'supervisors' . . . ." NLRB v. Yeshiva University, --- U.S. ----, 100 S.Ct. 856, 862, 63 L.Ed.2d 115 (1980).[14] The Hospital contends that the record demonstrates that Cafaro possessed several of the supervisory powers enumerated in § 2(11), including the power "effectively to recommend" the assignment, promotion and discharge of other employees, the power "responsibly to direct" other employees, and the power to "adjust their grievances." Consequently, the Hospital argues, Cafaro must be held to be a supervisor.
 
 
 17
 The Board, however, found that Cafaro "did not possess or exercise any of the statutory indicia of supervisory status." Noting that it has dealt repeatedly with the question whether head nurses are supervisors, the Board stated
 
 
 18
 the test for determining whether a health care professional is a supervisor is whether that individual, who may give direction to other employees in the exercise of professional judgment which is incidental to the professional's treatment of patients, also exercises supervisory authority in the interest of the employer.
 
 
 19
 (quoting Newton-Wellesley Hospital, 219 NLRB 699, 699-700 (1975)). This test represents an attempt by the Board to resolve the tension between the "overlapping directives" of § 2(12), which includes professional employees within the protections of the Act, and § 2(11), which excludes supervisors from those protections. See Finkin, The Supervisory Status of Professional Employees, 46 Fordham L.Rev. 805 (1977). The test is an elusive one, see id. at 829-30 (characterizing test as "highly porous"), but as the Supreme Court pointed out in Yeshiva, supra, 100 S.Ct. at 866 n. 30, Congress has expressly approved it. In the Health Care Act Amendments of 1974, Congress stated with approval that "the Board has carefully avoided applying the definition of 'supervisor' to a health care professional" whose direction of other employees is merely "incidental to" the treatment of patients. S.Rep. No. 93-766, 93rd Cong., 2d Sess. 6 (1974), reprinted in (1974) U.S.Code Cong. & Admin.News, pp. 3946, 3951.
 
 
 20
 Applying the test to this case, the Board concluded that Cafaro was not a statutory supervisor. The Board's determination "in this area (is) entitled to special weight," see Amalgamated Local 355 v. NLRB, 481 F.2d 996, 1000 (2d Cir. 1973), and is "to be accepted if it has 'warrant in the record' and a reasonable basis in law." NLRB v. Hearst Publications, Inc. 322 U.S. 111, 131, 64 S.Ct. 851, 861, 88 L.Ed. 1170 (1944); NLRB v. St. Francis Hospital of Lynwood, 601 F.2d 404, 420 (9th Cir. 1979). We believe that substantial evidence on the record considered as a whole warrants the Board's conclusion here. It is true that Cafaro was the head nurse[15] of the Hospital's unit designated as Floor 6 North, that although she worked only the day shift, she had twenty-four hour responsibility for the unit, and that taking into account all three shifts, three assistant nurses and approximately ten other nurses and ten aides and technicians reported to Cafaro. But most significantly, Cafaro and two other head nurses in turn reported to Lillian Tabai, one of the Hospital's six Nursing Care Coordinators (NCCs), who were also known as "Supervisors"; the NCCs were responsible to the Hospital's Director of Nursing. According to her job description, Cafaro's primary responsibility as head nurse was to maintain "the quality of patient care in the unit"; the other responsibilities listed in the job description e. g., the duty to assign and evaluate professionals and nonprofessionals, and to explain and ensure compliance with doctor's orders and Hospital policies relating to patient care can justifiably be considered to be incidental to the head nurse's primary duty to maintain the welfare of the patients in the unit.
 
 
 21
 The evidence was sufficient to allow the Board to find that in practice, as well as in theory, Cafaro's authority was primarily exercised in providing patient care, not in supervising employees on behalf of management.[16] While it is undisputed that Cafaro gave direction to the Hospital employees in her unit, the Board was warranted in finding that such direction was incidental to her professional duty to treat patients. For instance, Cafaro established a "team nursing" system on her unit, and rotated team leader assignments among the nurses on her unit, because she believed it to be a "very effective" method of supplying nursing care to a large group of patients. Similarly, Cafaro directed the nurses in the care they were to give the patients, selected certain nurses for training programs, and offered instruction in patient care techniques and the use of certain medical equipment.
 
 
 22
 In contrast, there was substantial evidence that Cafaro lacked real authority to make independent decisions not involving patient welfare. Thus, while she performed routine scheduling tasks e. g., preparing charts showing requested staff vacations and drawing up schedules of night and weekend assignments in accordance with Hospital guidelines[17] there was testimony that only her supervisor, Tabai, could approve the schedules;[18] on at least some occasions, Tabai apparently did in fact change the schedules Cafaro prepared. Likewise, there was evidence that only NCCs had the authority to grant overtime or to move a nurse from one shift to another.[19]
 
 
 23
 Finally, the Board was justified in concluding that Cafaro did not have the power "effectively to recommend" the promotion or discharge of other employees. Although Cafaro did not interview applicants for staff positions, she did fill out evaluation forms on the employees in her unit, which she then discussed with them; she also provided informal written and oral evaluations from time to time. However, Tabai reprimanded Cafaro when she once ventured to fill out the space on the evaluation form reserved for the recommendations of the "supervisor," or NCC; Tabai stated to Cafaro that "she would do what she had to without any suggestion" from Cafaro. Indeed, there was substantial evidence that Cafaro's recommendations were not acted upon. The Hospital points to two instances in which the Hospital eventually made personnel changes similar to those suggested by Cafaro; however, it was Cafaro's testimony that she had given Tabai revised recommendations prior to the time the Hospital acted. We see no basis in the record for overruling the Board's decision to credit this testimony, particularly since in both instances cited by the Hospital there was a significant interval between Cafaro's original recommendation and the Hospital's final decision to promote or discharge the employee in question. Similarly, there was an adequate basis in the record for the Board's finding that Cafaro had no authority to do more than orally counsel and reprimand employees,[20] and that only Tabai could take corrective action, or adjust employee grievances.
 
 
 24
 The Hospital also relies on other evidence to demonstrate that Cafaro was a supervisor, but none of it requires lengthy discussion. While head nurses met once a month with the NCCs and the Director of Nursing, the main topics at those meetings related to patient care. Similarly, although Cafaro filled out a form entitled "Outline Guide for Plans and Budget for 1978," that form requested suggestions for improving the unit, not budget recommendations. Lastly, whereas head nurses like Cafaro were paid approximately 12 and 1/2 cents more per hour than assistant head nurses, and were not required to punch time clocks, they received the same life insurance and medical benefits as did staff nurses, which were less than the benefits to which supervisors were entitled.
 
 
 25
 We do not suggest that the evidence here overwhelmingly pointed to only one conclusion or even that we would have decided the issue as the three-member panel of the Board did, had we been sitting in its place. Rather, the question is a close one turning on the precise facts, as the plethora of Board cases involving nurses indicates.[21] But it is in just such instances that we must not substitute our view of the facts for that of the Board. At the hearing, the Hospital did not present any witness to testify generally about the duties and responsibilities of head nurses at the Hospital, but relied on cross-examination of Cafaro and on documentary evidence to establish her supervisory status. An administrative law judge's credibility determinations are not usually disturbed; and the ALJ's rulings here on Cafaro are particularly crucial, since they credit her on points that weaken the effectiveness of documents relied on by the Hospital. In this court, the Hospital dissects the evidence at length, frequently prefacing its analysis with the phrase, "contrary to the Board's finding," and arguing to us as though it were our role to find the facts. It is not; our much more limited function in this regard, as already noted, is to determine whether the Board's findings are supported by substantial evidence on the record considered as a whole. We conclude that they are. Moreover, the Board utilized a test of supervisory status that, while not simple to apply, has nonetheless received the express approval of Congress, as the Supreme Court noted in Yeshiva, supra. Accordingly, we hold that the Board did not exceed its authority in ruling that Cafaro was not a supervisor, and we reject the Hospital's argument that her discharge did not violate § 8(a)(1). Under the circumstances, we need not decide whether, even if Cafaro was a supervisor, her discharge nevertheless violated the Act because it interfered with the exercise of the protected rights of others who were concededly Hospital employees. See, e. g., Gerry's Cash Markets, Inc. v. NLRB, 602 F.2d 1021, 1022-23 (1st Cir. 1979); Food Store Employees Union, Local 347 v. NLRB, 418 F.2d 1177, 1180-81 (D.C.Cir. 1969).
 
 
 26
 The petition for review is denied and the order of the Board is enforced.
 
 
 
 [1]
 The CIR consisted of members of the Hospital's house staff and training programs. The contract administrator was chosen to present the Report because she was not a member of the Hospital staff
 
 
 [2]
 The Community Board, which consists of members of the public interested in health care, informs the Hospital whether it is fulfilling the expectations of the community
 
 
 [3]
 Copies of the Report were given to members of the JCAH survey team; some copies apparently were passed to others present at the meeting
 
 
 [4]
 SNA had petitioned the Board on May 24, 1978 for certification as the representative of the nurses at the Hospital. On June 13, the parties approved a Stipulation for Certification upon Consent Election to be held on August 2; the voting unit excluded head nurses. Although Cafaro had been engaged in SNA organizational activities prior to June 13, it was her uncontradicted testimony that her activities ceased on that date, when she received notice that head nurses were not included in the unit
 
 
 [5]
 Dr. Cicero testified at the hearing that he discharged Cafaro because she allegedly had continued to participate in Union activity after June 13, see note 4 supra, and because she allegedly spread rumors about Dr. Cicero and his family and encouraged patients to complain. The ALJ stated that he could "give little or no weight" to these asserted reasons for the discharge in light of Dr. Cicero's failure to attempt to confirm any of the allegations which he admitted were based on hearsay or to confront Cafaro with them. The ALJ also pointed out that Dr. Cicero was unable to name a single source who had reported these allegations to him; it was therefore the ALJ's conclusion that "(s)uch improbable, self-serving, and unsupported testimony is . . . not worthy of belief."
 
 
 [6]
 Dr. Cicero admitted that he "surmised" or "thought" Cafaro had been a contributor to the Report. The circumstantial evidence also suggests that Dr. Cicero was aware of her participation. Thus, in his speech at the summation conference, Dr. Cicero referred to the Hospital's previous "involvement" with the three nurses whose floors were discussed in the Report. Likewise, he specifically excluded Cafaro and another contributor to the Report from the special head nurses' meeting on June 23; at that meeting, he explained that the two nurses had been excluded because of their involvement with the Report
 
 
 [7]
 Section 7 of the Act, 29 U.S.C. § 157, provides:
 Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in section 158(a)(3) of this title.
 
 
 [8]
 The Hospital seeks to distinguish Community Hospital on the ground, inter alia, that the statements there directly related to ongoing union organizational efforts. This distinction is unpersuasive, however, since § 7 protects "concerted activity" not only when it is undertaken "for the purpose of collective bargaining" but also when employees seek to further their interests "through channels outside the immediate employee-employer relationship." See Eastex, supra, 437 U.S. at 565, 98 S.Ct. at 2512
 
 
 [9]
 The Board noted that under the Code for Nurses of the American Nurses' Association (the Code), the Hospital's nurses were bound to act to improve the standards of nursing care and to join with others to meet the public's health care needs, § 9 of the Code; according to the Hospital's job description for Cafaro's position, compliance with the Code was a condition of employment. The Board found that Cafaro's contribution to the Report was "a step toward meeting" her professional obligations. The Hospital argues, however, that Cafaro's contribution to the Report "went beyond" the requirements of the Code, in that it was a general attack upon the Hospital, rather than a factual and objective report concerning the incompetent conduct of "any person," see § 4 of the Code; the Hospital also alleges that Cafaro violated § 2 of the Code by disclosing confidential patient chart information. Neither of these arguments is convincing. The Code required Cafaro to "take appropriate action regarding . . . any action on the part of others that is prejudicial to the patient's best interests. . . . If indicated, the practice should be reported to the appropriate authority within the institutional or agency setting," § 4 of the Code, Interpretive Statement; also, patient information can be disclosed to "others who are directly concerned with the patient's care." But in any event, we note that the Hospital does not assert that Cafaro was discharged because of any breach of the Code
 
 
 [10]
 See, e. g., NLRB v. Red Top, Inc., 455 F.2d 721 (8th Cir. 1972) (employee's bad faith threat to complain to customer constituted not a bid for public support but an attempt to interfere with employer's business relationships with its customers); American Arbitration Ass'n, Inc., 233 NLRB 71 (1977) (letter ridiculing employer sent to individuals doing business with employer, whose names employee obtained from confidential file); Coca Cola Bottling Works, Inc., 186 NLRB 1050 (1970) (leaflet designed to create fear in public that drinking Coca-Cola was harmful), modified, 466 F.2d 380 (D.C.Cir.1972); Univ. of Southern Calif. Security Dept., 99 LRRM 1728 (1978) (NLRB Division of Advice) (televised criticism of university security conditions; remarks not made as a protest relating to working conditions)
 
 
 [11]
 The Hospital takes issue with the Board's finding that the Report "was not published to the public or in such a way as to disparage (the Hospital) in the public's eye"; such a finding is "absurd," it submits, because members of the public and the Community Board were present at the "public information interview." We cannot agree. Even though members of the public may have been present at the meeting, it is apparent that the Report was aimed at the JCAH. The Board found on sufficient evidence that there was no indication that the Ad Hoc Committee attempted to publicize the Report outside the confines of the Hospital; indeed, as the Board stated, if the Report gained notoriety outside the meeting, "it was the actions of Dr. Cicero which focused such attention upon it."
 
 
 [12]
 Section 2(11) provides:
 The term "supervisor" means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 [13]
 Section 2(12) provides:
 The term "professional employee" means
 (a) any employee engaged in work (i) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning or a hospital, as distinguished from a general academic education or from an apprenticeship or from training in the performance of routine mental, manual, or physical processes; or
 (b) any employee, who (i) has completed the courses of specialized intellectual instruction and study described in clause (iv) of paragraph (a), and (ii) is performing related work under the supervision of a professional person to qualify himself to become a professional employee as defined in paragraph (a).
 
 
 [14]
 In Yeshiva, the Court found that university faculty members fell within the judicially created exemption to the Act for "managerial employees," and therefore did not reach the question whether the faculty were statutory supervisors. See 100 S.Ct. at 862. The Hospital, has not argued to us that Cafaro was a managerial employee
 
 
 [15]
 Head nurses were also known as "Associate Nursing Care Coordinators."
 
 
 [16]
 Cafaro testified that she allocated 70 per cent of her time to transmitting doctors' orders, instructing her staff with regard to patient care, making up work schedules, writing evaluations and attending meetings. Ten per cent of her time was spent on direct patient care, and 20 per cent was spent assisting doctors when they were with patients. In contrast, Tabai, who visited Cafaro's unit approximately three times a week, spent no time on patient care, and usually did not instruct the staff on patient care
 
 
 [17]
 In addition to the purely routine factors Cafaro considered in drawing up the schedules e. g., staff requests, seniority, and Hospital regulations she also took into account patient welfare, i. e., the need to maintain an adequate staff on duty to meet patient care needs
 
 
 [18]
 Although the Director of Nursing's memorandum concerning 1978-1979 vacations states that "(f)inal approval of vacations will be at the discretion of the Unit Supervisor and Head Nurse," Cafaro testified that Tabai exercised the right of final approval
 
 
 [19]
 Cafaro had the initial responsibility of attempting to find someone to work overtime if a member of her staff was sick. If none of her staff volunteered to stay, however, Cafaro was forced to ask Tabai for a substitute from another unit or a per diem employee; when necessary, Cafaro would work the overtime herself
 
 
 [20]
 Cafaro submitted written documentation of instances of staff misconduct to Tabai. However, only a NCC could issue formal written warnings to the employee
 
 
 [21]
 Compare, e. g., Newton-Wellesley Hospital, 219 NLRB 699 (1975); The Trustees of Noble Hospital, 218 NLRB 1441 (1975); Wing Memorial Hospital Ass'n, 217 NLRB 1015 (1975) with A. Barton Hepburn Memorial Hospital, 238 NLRB No. 10 (1978); Gnaden Huetten Memorial Hospital, Inc., 219 NLRB 235 (1975); The Presbyterian Medical Center, 218 NLRB 1266 (1975); Bishop Randall Hospital, 217 NLRB 1129 (1975)