TRADESMEN INTERNATIONAL,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Sheet Metal Workers' International Association, Local Union No. 33 of Northern Ohio, AFL–CIO, Intervenor.

No. 00–1523.

United States Court of Appeals,
District of Columbia Circuit.

Argued Dec. 6, 2001.

Decided Jan. 15, 2002.

Maurice Baskin argued the cause and filed the briefs for petitioner.

Michael E. Avakian was on the brief for amici curiae Associated Builders and Contractors, Inc. and the Center on National Labor Policy, Inc.

Richard A. Cohen, Senior Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were Arthur F. Rosenfeld, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Fred L. Cornnell, Attorney.

Craig Becker argued the cause for intervenor. With him on the brief was Richard P. James.

Before: SENTELLE and ROGERS, Circuit Judges, and WILLIAMS, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Tradesmen International, Inc. ("Tradesmen"), a labor leasing company, petitions this Court for review of a National Labor Relations Board ("NLRB" or "the Board") decision in which the NLRB found that Tradesmen violated sections 8(a)(1) and (3) of the National Labor Relations Act ("the Act"), 29 U.S.C. §§ 158(a)(1), (a)(3), by refusing to hire Matthew Oakes, a union organizer, after he unsuccessfully lobbied the city of Lorain, Ohio to require Tradesmen to pay a surety bond for work performed in the city. Tradesmen argues in part that its refusal to hire Oakes did not violate the Act because Oakes's activity before the Lorain Board of Building Standards and Appeals was not protected activity. Because we find that the NLRB failed to establish a nexus between Oakes's activity and the employment conditions of Tradesmen or union workers, we grant the petition for review and vacate the decision and order of the NLRB.

## I. Background

In July 1996, the city of Lorain, Ohio adopted Ordinancè 118–96 ("Lorain Ordinance"), which requires general and subcontractors to post a $5000 surety bond when performing construction work in the city. Of particular significance to this case is the ordinance's definition of "Sub–Contractor," which means "any person who performs a special skill, trade, craft, or profession as a business for profit in the City, and as part of a ·construction contract, whether on behalf of the general contractor, building owner, or agent of an owner." Lorain, Ohio, Ordinance 118–96 § III(b)(2) (July 25, 1996). Petitioner Tradesmen is a construction labor leasing company. It does not bid on, nor does it become a party to, construction contracts. Rather, it "leases" skilled workers to con-

struction companies that bid on, and enter into, construction contracts.

On January 15, 1997, Tradesmen contracted with Bay Mechanical and Electrical, Inc. ("Bay Mechanical") to supply it with employees who could work on a large construction project in Lorain. Bay Mechanical, as a subcontractor on the project, posted a bond. Tradesmen, as a leasing company, did not. In late March 1997, Matthew Oakes, a union organizer for the Sheet Metal Workers International Association, Local Union No. 33 of Northern Ohio, AFL–CIO ("the Union"), contacted Tradesmen and inquired about openings for Heating, Ventilation and Air Conditioning ("HVAC") positions. Although Oakes was qualified for HVAC positions, there were no such positions available through Tradesmen at that time. A few months later, Oakes met with Lorain City Building Inspector Jack Murphy and provided him with a list of three companies, including Tradesmen, that Oakes believed were violating the Lorain Ordinance by operating as subcontractors but not posting bonds. As a result, Murphy ordered all Tradesmen employees to vacate the Bay Mechanical construction site. However, at Tradesmen's request, Murphy allowed Tradesmen employees to return to the job site pending a ruling by the Lorain Board of Building Standards and Appeals ("Lorain Board") as to whether Tradesmen was to be considered a "subcontractor" for purposes of the Lorain Ordinance.

The Lorain Board held a hearing on May 28, 1997. Oakes attended the hearing accompanied by union counsel and, after identifying himself as a Local 33 member, testified that Tradesmen should be subject to the Lorain Ordinance because it operated as a subcontractor. Tradesmen responded that it was an employee leasing agency that merely provided other companies with skilled workers. The Lorain

Board adjourned without immediately rendering an opinion. Two days later, Oakes contacted Tradesmen to inquire once again about available HVAC work. He was informed by Tradesmen's Vice President that because he intentionally tried to hurt Tradesmen's business at the Lorain Board hearing, Tradesmen would not hire Oakes for any open positions. In response to that conversation, the NLRB's General Counsel filed a complaint alleging that Tradesmen violated sections 8(a)(1) and (3) of the Act. Specifically, the complaint alleged that Tradesmen refused to hire Oakes because he tried to lobby the city of Lorain to require Tradesmen to pay a surety bond, thus increasing Tradesmen's cost of doing business in Lorain. In June 1997, the Lorain Board issued its ruling: Tradesmen was not a subcontractor for purposes of the Lorain Ordinance and was therefore not required to post a bond.

## II. Proceedings Below

The General Counsel's complaint was heard before an Administrative Law Judge ("ALJ"), who dismissed the complaint after finding that Oakes's "solo effort to increase Tradesmen's cost of doing business in Lorain was not 'concerted activity' as defined by Section 7 of the Act." *Tradesmen International, Inc.*, 332 NLRB No. 107, 2000 WL 1679479, at *13 (Oct. 31, 2000) (hereinafter *Tradesmen*). The ALJ also held that even if Oakes's activity was concerted, it was not otherwise protected under section 7 because "Oakes's lobbying efforts ... had absolutely nothing to do with the specific terms and conditions of employment." *Id.* That is, Oakes's effort to apply the Lorain Ordinance to Tradesmen did not involve employee-employer relations, nor was it even generally related to employees' interests. Instead, the purpose of the Lorain Ordinance was to fund the city's building department, "as opposed to having anything to do with the employ-

ees of various contractors or subcontractors working in the city." *Id.* Finally, the ALJ held that Oakes's activity was unprotected under section 7 because "it was designed to injure Tradesmen's business" and "posed a threat of immediate harm to Tradesmen's business operation in Lorain," which, if effective, would have harmed Tradesmen employees as well. *Id.* at *14.

The General Counsel filed exceptions to the ALJ's findings and the case was heard before the Board. The Board reversed the decision of the ALJ, finding that Oakes's May 28 testimony before the Lorain Board was concerted, protected activity. *Id.* at *3. In particular, the Board found "a nexus between Oakes's activity and employees' legitimate concern over their continued employment." *Id.* at *4. The Board explained that Oakes's efforts were intended to protect local unionized companies and the job opportunities of their employees, and was similar in that respect to area-standards picketing, a protected activity under the Act. *Id.* Board Member (now Chairman) Hurtgen dissented from the decision, finding instead that Oakes's activity, while concerted, was nonetheless unprotected because Oakes failed to establish any relationship between the bonding ordinance and employees' terms and conditions of employment. *Id.* at *8.

Tradesmen petitions for review, challenging the Board's findings that Oakes's activity before the Lorain Board was concerted activity for mutual aid or protection protected under section 7 of the Act. The Board, supported by Intervenor Sheet Metal Workers' International Association, Local No. 33 of Northern Ohio, AFL–CIO, cross-petitions for enforcement.

## III. Analysis

Our review of NLRB decisions is limited. *See, e.g., Pioneer Hotel, Inc. v.*

*NLRB,* 182 F.3d 939, 942 (D.C.Cir.1999). We will affirm the judgment of the Board unless, "upon reviewing the record as a whole, [this Court] conclude[s] that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *International Union of Electronic, Elec., Salaried, Mach. & Furniture Workers v. NLRB,* 41 F.3d 1532, 1536 (D.C.Cir.1994) (internal quotations and citations omitted). We will not, however, " 'merely rubber-stamp NLRB decisions.' " *Douglas Foods Corp. v. NLRB,* 251 F.3d 1056, 1062 (D.C.Cir.2001) (quoting *Avecor, Inc. v. NLRB,* 931 F.2d 924, 928 (D.C.Cir.1991)). As we have said before,

> this court is a reviewing court and does not function simply as the Board's enforcement arm. It is our responsibility to examine carefully both the Board's findings and its reasoning, to assure that the Board has considered the factors which are relevant to its choice of remedy, selected a course which is remedial rather than punitive, and chosen a remedy which can fairly be said to effectuate the purposes of the Act.

*Peoples Gas Sys., Inc. v. NLRB,* 629 F.2d 35, 42 (D.C.Cir.1980). In that light, we review the Board's conclusion that Oakes's testimony before the Lorain Board was protected activity under section 7 of the Act and that Tradesmen committed an unfair labor practice by refusing to hire him following his testimony.

 In relevant part, section 7 states: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and *to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection.*" 29 U.S.C. § 157 (emphasis added).

Defining the scope of section 7's protections "is for the Board to perform in the first instance as it considers the wide variety of cases that come before it." *NLRB v. City Disposal Systems, Inc.,* 465 U.S. 822, 829, 104 S.Ct. 1505, 79 L.Ed.2d 839 (1984). Thus, if an issue arises that implicates the Board's expertise in labor relations, "a reasonable construction by the Board is entitled to considerable deference." *Id.*

 The Board concedes that Tradesmen's refusal to hire Oakes only constitutes an unfair labor practice if Oakes's testimony before the Lorain Board was protected by section 7. *Tradesmen,* 2000 WL 1679479, at *2. Our analysis of whether Oakes's activity enjoys section 7's protections is guided by Supreme Court precedent, which clearly provides that the "mutual aid or protection" clause in section 7 includes employees' efforts "to improve terms and conditions of employment or otherwise improve their lot as employees through channels outside the immediate employee-employer relationship." *Eastex, Inc. v. NLRB,* 437 U.S. 556, 565, 98 S.Ct. 2505, 57 L.Ed.2d 428 (1978). This includes employees' "resort to administrative and judicial forums" to improve their working conditions. *Id.* at 566 & n. 15, 98 S.Ct. at 2513 & n. 15 (collecting cases). But the "mutual aid or protection" clause is not without bound. That is, an employee's activity will fall outside section 7's protective reach if it fails in some manner to relate to "legitimate employee concerns about employment-related matters." *Kysor/Cadillac,* 309 NLRB 237, 237 n. 3, 1992 WL 301638 (1992); *see Eastex,* 437 U.S. at 567–68, 98 S.Ct. at 2513–14. Thus an essential element before section 7's protections attach is a nexus between one's allegedly protected activity and "employees' interests as employees." *Eastex,* 437 U.S. at 567, 98 S.Ct. 2505 at 2513.

With the limits of section 7's protections in mind, we turn to the Board's decision.

■ We assume without deciding that Oakes's activity as a union representative constituted concerted activity, *see City Disposal Systems*, 465 U.S. at 832–33, 104 S.Ct. at 1511–12, but reject the Board's finding that his activity was protected under section 7. Our deferential review of Board decisions notwithstanding, the record before us provides no evidence to support a nexus between Oakes's efforts to impose a bond on Tradesmen and any employee-related matters. The relationship between Oakes's lobbying efforts and "employees' interests as employees" was "so attenuated that [it] cannot fairly be deemed to come within the 'mutual aid or protection' clause" of section 7. *Eastex*, 437 U.S. at 568, 98 S.Ct. at 2513–14. The Board's attempt to characterize Oakes's activity as "similar to area-standards picketing" is unsupported and unsupportable.

■ The Board justified its decision by claiming a nexus between Oakes's activity and union employee concerns over continued employment. *Tradesmen*, 2000 WL 1679479, at *4. The Board found that "Oakes's attempt to secure [Tradesmen's] compliance with the Lorain bonding ordinance was designed to protect local unionized companies and, in turn, the job opportunities of their employees, by ensuring that [Tradesmen] did not have an undue bidding advantage in the Lorain construction market." *Id.* Tradesmen argued at length that because Oakes's activity hurt rather than benefitted Tradesmen employees, it cannot be considered protected under the Act. Protected behavior is not limited to just those concerted activities that benefit the actor's fellow employees. The Supreme Court has made clear that an employee may engage in otherwise proper concerted activities to support employees of employers *other* than his own.

*See Eastex*, 437 U.S. at 564, 98 S.Ct. at 2511–12. Thus, even if he was an employee of Tradesmen (a point on which the parties disagree and which we decline to address), Oakes was free to engage in behavior that supported *union* employers and employees. Indeed, Oakes openly admitted to the ALJ that his purpose before the Lorain Board, "as a representative of the union and as an organizer, [was] to level [the] playing field as much as possible" between union and non-union companies. The Board agreed that "if the Lorain Board had found that [Tradesmen] was subject to the bonding ordinance, then [Tradesmen's] cost of doing business in Lorain would have increased." *Tradesmen*, 2000 WL 1679479, at *5.

Despite *Eastex*'s recognition that non-union employers may be acceptable targets of union employees' concerted activities, we fail to see in the first instance how a bonding ordinance that applies equally to union and non-union entities can be said to be a means of leveling the playing field between the two, and we further fail to see how invoking the application of a requirement that is wholly unrelated to employment issues relates in any sense to "employees' interests as employees." *Eastex*, 437 U.S. at 567, 98 S.Ct. at 2513. The Board has simply failed to provide an adequate or persuasive explanation to us. The explanation it does provide, that Oakes's activity was similar to area-standards picketing and that forcing Tradesmen to pay a bond would "protect local unionized companies," is wholly invalid. *Tradesmen*, 2000 WL 1679479, at *4.

Area-standards picketing is a protected activity under the Act. *See, e.g., O'Neil's Markets v. NLRB*, 95 F.3d 733, 737 (8th Cir.1996) (area-standards hand billing by non-employees protected); *NLRB v. Browning–Ferris Industries*, 700 F.2d 385, 387–88 (7th Cir.1983) (employees' refusal to cross picket line at customer's property

protected); *Yellow Cab, Inc.,* 210 NLRB 568, 569, 1974 WL 5026 (1974) (employee's distribution of handbills supporting other employer's employees protected). It is an effective means "by which unions attempt to protect their constituents' jobs by generating public and economic pressure on nonunion employers to pay higher wages and benefits to their employees, thereby ending unfair competitive advantage." *Tradesmen,* 2000 WL 1679479, at *4. That is, union employees may effectively protect their job security by seeking to raise non-union employment wages and benefits (or "standards") to the levels of union standards, thereby increasing non-union employers' costs and succeeding, albeit indirectly, in "leveling the playing field." Here, however, the bonding requirement is not a "union standard." It applied to all subcontractors, whether they employed union workers, non-union workers, or both. Moreover, in the traditional area-standards picketing scenario, benefits flow to both union and non-union employees. When effective, union employees receive increased job security and non-union employees receive, for example, increased employee benefits, or at least that is the theory, and a plausible outcome in many cases. In the present case, Oakes's activity was not an effort to improve any employees' (union or non-union) working conditions. So far as the record shows, it was solely an effort to raise Tradesmen's costs. Paying the bond would not place Tradesmen on a more level playing field with union companies, it would instead subject leasing companies to one discreet element of construction costs required of contractors and subcontractors, regardless of whether either the leasing companies or contractors employed union or non-union employees. Moreover, neither the Board nor the intervening union has suggested any meaningful sense in which the bond related to employees' interests as employees. The half-hearted suggestion at oral argument that because the proceeds of the bond funded city inspection departments the bond related to employees' interest in the safety of working conditions is unconvincing. There is no showing, nor is it likely that there could be any, that there would have been more or better inspections if the bonds paid by contractors and subcontractors had been supplemented by other entities supplying them labor, or by any other suppliers with whom they might deal.

■ The Board's decision suggests a new standard that any activity that raises a non-union employer's costs "levels the playing field" between union and non-union employers, even if unrelated to working conditions or union/non-union status, and is therefore protected under the Act. This standard, it seems, would apply whether the activity resulted in a benefit to non-union employees, as in area-standards picketing, or resulted in harm to non-union employees, as was the case here. But such a standard effectively erases any line between acceptable and unacceptable activity directed toward an employer's economic health. We reject this sweeping and unprecedented expansion of "concerted activity for mutual aid or protection." As the Supreme Court has stated, and as the Board has previously agreed, for an employee's concerted activities to be protected under the Act, the activity must bear an identifiable relationship or nexus to legitimate employee concerns about employment-related matters. *See Eastex,* 437 U.S. at 565–68, 98 S.Ct. at 2513–14; *Kysor/Cadillac,* 309 NLRB, at 238 n. 3. Because Oakes's lobbying efforts did not, we reject the Board's conclusion that they were protected under the Act.

■ We need not and do not decide whether the Act requires that an employee's concerted activities result in an actual, measurable benefit to a targeted employer's employees. We note, however, that

our research has failed to produce any case where, if the targeted employer had acquiesced to the demands of the picketing employees, the targeted employees would directly suffer, rather than benefit.[1] At oral argument, the Union urged us to recognize that, because only licensed applicants are approved for the bond, Tradesmen employees' benefit would be to operate under a state license that guaranteed their qualifications, experience, and training. *See* Lorain, Ohio, Ordinance 118–96, § III(d) (July 25, 1996). This argument is a difficult one to follow. By definition, employees who are leased from a labor leasing company will always be operating under the license of the subcontractor or contractor leasing them, regardless of whether their leasing company held a license independently. In any event, we do not address whatever merit this argument might (or might not) have, as the Board did not rely on the benefits of licensing as the basis for its opinion. We cannot consider such justification now, because "[a]gency decisions must generally be affirmed on the grounds stated in them." *Association of Civilian Technicians v. FLRA,* 269 F.3d 1112, 1117 (D.C.Cir.2001); *see also, Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action. . . .").

At oral argument, the Board's counsel asserted that *Petrochem Insulation, Inc. v. NLRB,* 240 F.3d 26 (D.C.Cir.2001), supports its decision in this case. We disagree. In that case, we upheld the Board's finding that unions who filed environmental objections to zoning and construction permits sought by non-union contractors were protected activities. The Board, we noted, relied on the unions'

statement that they sought to "force construction companies to pay their employees a *living wage, including health and other benefits." Id.* at 30 (emphasis added) (citation omitted). If the unions were successful, the Board reasoned, they would expand union members' job opportunities while improving their bargaining power for higher wages. *See id.* Thus it is clear that even though union members were actively opposing the hiring of non-union contractors, the union's stated purpose was to force non-union employers to conform to area wage and benefit standards—a goal that, if accepted by the non-union employers, would benefit non-union employees. Such activity, unlike a bond requirement, relates to "employees' interests as employees." *Eastex,* 437 U.S. at 567, 98 S.Ct. at 2513.

The Board also relied on the Ninth Circuit's decision in *Kaiser Engineers v. NLRB,* 538 F.2d 1379, 1385 (9th Cir.1976), holding that lobbying members of Congress in an effort to change the national immigration policy was action taken for "mutual aid or protection" under section 7 because the policy could affect the engineers' job security. The facts of that case, though, are distinguishable from ours. The *Kaiser* court was considering whether protected activity could occur "outside the strict confines of the employment relationship." *Id.* No one argues before us that employees may not petition, lobby, picket or otherwise direct their concerted activities toward entities other than their employers or other employees' employers. Specifically, the Ninth Circuit held that "lobbying legislators" for policy changes affecting employee "job security" was protected activity. *Id.* The policy at issue involved easing restrictions on the importation of foreign engineers who would compete directly with American engineers for

---

1. An arguable exception, *NLRB v. Circle Bindery,* 536 F.2d 447 (1st Cir.1976), is distinguishable from the present case for reasons set forth later in this opinion.

jobs. In our case, we are not concerned with a policy that would flood the labor market and affect workers' job security. We are concerned with whether the application of a bonding ordinance that applies equally to union and nonunion subcontractors affects the job security of union employees. It does not.

While unable to identify a case supporting its position at oral argument, the Board came closer to success in its brief, although not close enough, in citing *NLRB v. Circle Bindery,* 536 F.2d 447 (1st Cir. 1976). The question before the First Circuit in *Circle Bindery* was whether a union employee's "policing" of a non-union employer's adherence to specific contract terms was protected under section 7. In that case, a union employee notified the union that his employer was labeling books with a union "bug" (a mark indicating that the book was bound by union employees) in violation of its customer's contract. *See id.* at 449. The union then sought and caused the non-union company to lose the binding contract. As here, the employer argued that because the employee's actions were detrimental to the company and did not benefit its own employees, the actions were unprotected under section 7. The Board, however, ruled that the employee's actions, although harmful to the employer's business, were nonetheless protected because they were "directed solely to protect[ ] himself and his fellow members of the Union by preventing misuse of the union label which could undercut the Union's standards." *Id.* at 451. The court, in upholding the Board's decision, found that the non-union employer's obtaining of the work "was a direct violation of its customer's union contract," so any harm the employer sustained "was merely to lose work which ... it should not have received in the first place." *Id.* at 452–53.

The Board cites *Circle Bindery* for the proposition that "promoting the employ-ment of union members under union conditions" is protected by the Act. *Id.* at 452. We do not disagree. That proposition simply has nothing to do with the alleged unfair labor practice by Tradesmen found by the Board. Oakes's activity did not involve union conditions. It did not involve non-union conditions. Indeed it did not involve any employee-related conditions at all. It involved a bond. Rather than raise the level of employee terms or conditions of employment, the bond raises funds for the city. Such city fund raising, however, bears too attenuated a relationship to employees' interests as employees. As such, Oakes's actions to enforce the bond against Tradesmen cannot enjoy section 7's protections.

IV. Conclusion

For the reasons stated, we grant the petition for review, vacate the decision and order of the Board, and deny the Board's cross-petition for enforcement.