**316**

BEVERLY HEALTH & REHABILITA-
TION SERVICES, INC. and Beverly
Enterprises—Pennsylvania, Inc., Peti-
tioners,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

District 1199P, Service Employees
International Union, AFL–
CIO, Intervenor.

No. 01–1405.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 19, 2002.

Decided Jan. 31, 2003.

Thomas P. Dowd argued the cause for the petitioners.

Usha Dheenan, Attorney, National Labor Relations Board, argued the cause for the respondent. Arthur F. Rosenfeld, General Counsel, John H. Ferguson, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and Meredith Jason, Attorney, were on brief.

Craig Becker argued the cause for the intervenor. Judith Scott was on brief.

Before: SENTELLE, HENDERSON and TATEL, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

KAREN LeCRAFT HENDERSON, Circuit Judge:

 Beverly Health & Rehabilitation Services, Inc., which operates approximately 950 nursing homes nationwide, and its subsidiary Beverly Enterprises—Pennsylvania (collectively Beverly) seek review of a decision of the National Labor Relations Board (NLRB or Board). The Board concluded that Beverly committed various unfair labor practices (ULPs) at 20 nursing homes Beverly operates in Pennsylvania in violation of the National Labor Relations Act (Act), 29 U.S.C. §§ 151 *et*

seq. See *Beverly Health & Rehab. Servs., Inc.*, 335 N.L.R.B. No. 54, 2001 WL 1076116 (Aug. 27, 2001) (NLRB Dec.). In its decision, the Board directed Beverly to post two separate remedial notices: one at all of the Pennsylvania nursing homes involved in this proceeding and a second at all of Beverly's nursing homes nationwide. Beverly challenges seven of the Board's ULP findings as well as the nationwide scope of the remedy. For the reasons set forth below, we conclude the petition should be granted as to two ULPs–those based on Beverly's refusal to rehire striking employees and its videotaping of picketing employees. In all other respects, the petition for review should be denied.[1]

## I.

In the fall of 1994 Beverly and District 1199P of the Service Employees International Union, AFL–CIO (Union) were negotiating new collective bargaining agreements for employees at the 20 Pennsylvania nursing homes in this case. At the time, bargaining units at all but three of the facilities were covered by agreements set to expire on November 30, 1994, units at two other homes were covered by agreements set to expire on December 31, 1994 and the remaining unit was newly certified and not yet covered by an agreement. Negotiations continued until Spring 1996.

Beginning on February 13, 1996 the Union's locals filed a series of ULP charges, all of which were ultimately consolidated into one complaint. On November 26, 1997 the ALJ issued a decision finding Beverly committed numerous ULPs and ordering Beverly to cease and desist and to post notices at all of the nursing homes

---

1. With respect to the ULP findings that Beverly does not contest, the Board is entitled to summary enforcement. *International Union of Petroleum & Indus. Workers v. NLRB,* 980 F.2d 774, 778 (D.C.Cir.1992) (citing *Retail Clerks Union, Local 1401 v. NLRB,* 463 F.2d 316, 320 (D.C.Cir.1972)).

involved. NLRB Dec. at 41. The ALJ specifically reserved for a supplemental proceeding the determination "whether remedies should extend to any or all of the interrelated Beverly Companies." *Id.* He issued a supplemental decision on November 30, 1999 which recommended a single cease-and-desist order to be posted at all of Beverly's facilities nationwide. NLRB Dec. at 43–59. Beverly filed exceptions to the ALJ's decisions on December 28, 1999.

The Board issued a decision dated August 27, 2001 in which it "affirm[ed] the judge's rulings, findings, and conclusions." NLRB Dec. at 1. The Board revised the remedy to require two separate notices, one addressing the particular ULPs in this case to be posted only at the 20 subject Pennsylvania facilities (and corporate offices overseeing them), *id.* at 14–17 (App. A), and a broader one to be posted company-wide, *id.* at 17–18 (App. B).

Beverly filed a petition for review on September 9, 2001. The Board filed a cross-application for enforcement on November 8, 2001.

## II.

■ Beverly challenges seven of the ULP findings as well as the company-wide scope of the remedy. "We will affirm the judgment of the Board unless, 'upon reviewing the record as a whole, [this Court] conclude[s] that the Board's findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case.'" *Tradesmen Int'l, Inc. v. NLRB,* 275 F.3d 1137, 1141 (D.C.Cir.2002) (quoting *International Union of Electronic, Elec., Salaried, Mach. & Furniture Workers v. NLRB,* 41 F.3d 1532, 1536 (D.C.Cir.1994)). We apply this standard to each of Beverly's contentions *seriatim.*

### A. Refusal to Reinstate Striking Employees

First, Beverly contests the ALJ's finding, summarily affirmed by the Board, that Beverly violated the Act by failing to promptly reinstate 450 employees after a three-day strike the Union began on April 1, 1996. Beverly contends the strike was unlawful because the Union failed to comply with the statutory notice requirement in section 8(g) of the Act, 29 U.S.C. § 158(g). We agree and, accordingly, conclude that Beverly was under no duty to rehire the workers who participated in the unlawful strike.

Section 8(g) provides:

(g) Notification of intention to strike or picket at any health care institution

A labor organization before engaging in any strike, picketing, or other concerted refusal to work at any health care institution shall, not less than ten days prior to such action, notify the institution in writing and the Federal Mediation and Conciliation Service of that intention, except that in the case of bargaining for an initial agreement following certification or recognition the notice required by this subsection shall not be given until the expiration of the period specified in clause (B) of the last sentence of subsection (d) of this section. The notice shall state the date and time that such action will commence. The notice, once given, may be extended by the written agreement of both parties.

29 U.S.C. § 158(g). On March 14 and 15, 1996 Union locals sent notices to fifteen facilities that they intended to strike at 7:00 a.m. on March 29. On March 27, however, the Union sent a second notice purporting to extend the strike deadline 71 hours to 6:00 a.m. on Monday April 1. NLRB Dec. at 37. In a letter dated

March 28, 1996 Beverly responded that it considered the March 27 notification a new notice requiring an additional 10 days before the Union workers could lawfully strike under section 8(g).

■ Before the ALJ Beverly again asserted the strike was unlawful under section 8(g). The ALJ rejected Beverly's defense because the Board's "clear and consistent precedent," tracing to its pre-*Chevron* decision in *Greater New Orleans Artificial Kidney Center,* 240 N.L.R.B. 432, 1979 WL 8714 (1979), construed section 8(g) to permit a union to unilaterally extend a strike deadline for up to 72 hours. We review the board's construction of section 8(g) under the familiar *Chevron* analysis:

> If ... " 'Congress has directly spoken to the precise question at issue,' " we "must give effect to Congress's 'unambiguously expressed intent.' " *Secretary of Labor v. [Fed. Mine Safety & Health Review Comm'n],* 111 F.3d 913, 917 (D.C.Cir. 1997) (quoting *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). "If 'the statute is silent or ambiguous with respect to the specific issue,' we ask whether the agency's position rests on a 'permissible construction of the statute.' " *Id.* (quoting *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782, 81 L.Ed.2d 694).

*National Multi Housing Council v. U.S. E.P.A.,* 292 F.3d 232, 234 (D.C.Cir.2002) (quoting *Cyprus Emerald Resources Corp. v. Fed. Mine Safety & Health Review Comm'n,* 195 F.3d 42, 45 (D.C.Cir.1999)). We conclude section 8(g) manifests an "unambiguously expressed intent" that precludes the Board's interpretation.

■ Section 8(g) expressly states that before commencing a strike at a health care institution a union "shall, not less than ten days prior to such action, notify the institution in writing" and that the "notice shall state the date and time that such action will commence." The meaning of this mandatory language could not be plainer or the Congress's intent in enacting it clearer. The notice must provide ten days notice of a strike specifying the day and time it is to occur. Neither the initial notices the locals sent on March 14–15, 1996 nor the "extension" sent on March 27 satisfy this requirement. Although the former provided adequate notice of a strike to commence on April 29, as it turned out the strike did not begin until three days after that date; the extension, on the other hand, accurately identified the date of the strike but did not afford the requisite ten days' notice. Nor do either fall within the single statutory exception to the otherwise rigid notice requirement: that "[t]he notice, once given, may be extended by the written agreement of both parties."

Despite the plain meaning of the statute, the Board contends that it is somehow ambiguous because it does not expressly state that agreement of the parties is the *only* means to obtain an extension. No such express provision is necessary. If the Congress had intended to allow either party to extend the notice unilaterally, it could easily have said so—but it did not. Instead the Congress carved out but a single express exception—when both parties consent in writing—an exception that would be unnecessary if either party could unilaterally extend the notice at will. This is a case where "the cannons [sic] of avoiding surplusage and *expressio unius* are at their zenith" because "they apply in tandem." *Independent Ins. Agents, Inc. v. Hawke,* 211 F.3d 638, 645 (D.C.Cir.2000) (citing *Halverson v. Slater,* 129 F.3d 180, 184–86 (D.C.Cir.1997)). The Board's ambiguity argument therefore fails.

### B. *Denial of Access to Workplace*

■ Second, Beverly challenges the Board's finding that it committed a ULP

when Wayne Chapman, Beverly's Senior Regional Director of Associate Relations, directed that the Union be denied access to Beverly's facilities, including bulletin boards, in a December 1, 1994 memorandum, although such access had been a term of the expired contracts. We conclude this finding should be upheld.

█ In *Litton Fin. Printing Div. v. NLRB,* 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991), the United States Supreme Court stated: "The Board has determined, with our acceptance, that an employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment." 501 U.S. at 198, 111 S.Ct. at 2221 (citing *NLRB v. Katz,* 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962)). This is precisely what Beverly did in this case. Nor does the denial of access fall into any of the four established exceptions to the unilateral change rule enumerated in *Litton:* arbitration clauses, no-strike clauses, union security clauses and dues check-off provisions. *Id.* at 199–200, 111 S.Ct. at 2221–22.

Beverly suggests that the Court in *Litton* excluded contract terms from the rule because they affect the relationship between the employer and the union, as opposed to the relationship between the employer and the employees, and that we should therefore except the present term as well. The *Litton* Court, however, drew no such distinction. Equally misplaced is Beverly's reliance on cases holding that unions do not ordinarily have a right to trespass. *See, e.g., NLRB v. Babcock & Wilcox Co.,* 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956); *Lechmere, Inc. v. NLRB,* 502 U.S. 527, 538–39, 112 S.Ct. 841, 848–49, 117 L.Ed.2d 79 (1992); *United Food and Commercial Workers v. N.L.R.B.,* 74 F.3d 292, 300 (D.C.Cir.1996). None of those cases involved a contractual

right to access. In sum, it was not arbitrary, capricious or otherwise contrary to law for the Board not to exempt union access provisions from the unilateral change doctrine.

### C. Management Rights Clause

Third, Beverly challenges the Board's finding that it committed a ULP by implementing various changes that it claims were authorized by the expired management rights clause. The Board asserts, *inter alia,* that Beverly is barred from challenging the ULP here because the issue was already conclusively decided by the Sixth Circuit Court of Appeals in *Beverly Health & Rehab. Servs. v. NLRB,* 297 F.3d 468 (6th Cir.2002). We agree.

█ As we have previously stated:

[T]he standards for establishing the preclusive effect of an earlier holding are:

First, the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case. Second, the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case.... Third, preclusion in the second case must not work a basic unfairness to the party bound by the first determination. An example of such unfairness would be when the losing party clearly lacked any incentive to litigate the point in the first trial, but the stakes of the second trial are of a vastly greater magnitude.

*Hall v. Clinton,* 285 F.3d 74, 82 n. 9 (D.C.Cir.2002) (quoting *Yamaha Corp. of Am. v. United States,* 961 F.2d 245, 254 (D.C.Cir.1992) (alteration original), *cert. denied,* 506 U.S. 1078, 113 S.Ct. 1044, 122 L.Ed.2d 353 (1993)). This case satisfies all three requirements. First, the Sixth Circuit had before it the same manage-

ment rights clause at issue here at two of the same facilities—Grandview and Caledonia. Second, the Sixth Circuit decided to "affirm the Board's conclusion that the management-rights clause [there] did not continue after the termination of the contract." 297 F.3d at 483. Third, Beverly had every incentive to—and did—litigate the issue before the Sixth Circuit so that there is no unfairness in holding Beverly to the result reached there.[2]

### D. Supervisory Status of Licensed Practical Nurses at Haida Manor

 Fourth, Beverly challenges the Board's determination that the licensed practical nurses (LPNs) at Beverly's Haida Manor facility are not supervisors under the Act and, specifically, that they did not supervise the work of "certified nurse assistants" (CNAs). The Board determined Beverly "ha[d] not met its burden of establishing that the LPNs are supervisors" because "the judge's extended fact-findings ... confirm that, contrary to the Respondent's contentions, the LPNs exercised only 'routine' authority that did not require the use of independent judgment in directing the work of other employees within the meaning of Sec. 2(11)." NLRB

Dec. at 1 n.3. We uphold the Board's determination.

Section 2(11) of the Act defines "supervisor" as follows:

> The term 'supervisor' means any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.

29 U.S.C. § 152(11). The ALJ expressly found that "LPNs have no involvement in many decisions typically reserved to supervisors," citing specific testimony in the record to show that LPNs neither trained individuals to become CNAs nor oriented new CNAs, that they exercised no authority over the CNAs' work, overtime or shift assignments, time off, grievances, lay-offs and recalls, discipline or hiring (at least not "before the spring of 1996" and "[e]ven then, ... the LPNs did not hire CNAs or make effective recommendations as to the hiring of CNAs"). NLRB Dec. at 33–34.

2. It is true, as Beverly observes, that the Supreme Court has recognized "an exception to the applicability of the principles of collateral estoppel for 'unmixed questions of law' arising in 'successive actions involving unrelated subject matter.'" *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 171, 104 S.Ct. 575, 579, 78 L.Ed.2d 388 (1984) (quoting *Montana v. United States*, 440 U.S. 147, 162, 99 S.Ct. 970, 978, 59 L.Ed.2d 210 (1979); citing *Allen v. McCurry*, 449 U.S. 90, 95 n. 7, 101 S.Ct. 411, 415 n. 7, 66 L.Ed.2d 308 (1980); *United States v. Moser*, 266 U.S. 236, 242, 45 S.Ct. 66, 67, 69 L.Ed. 262 (1924)). The Court has also narrowly limited the exception:

> "[W]hen the claims in two separate actions between the same parties are the same or are closely related ... it is not ordinarily necessary to characterize an issue as one of

fact or of law for purposes of issue preclusion.... In such a case, it is unfair to the winning party and an unnecessary burden on the courts to allow repeated litigation of the same issue in what is essentially the same controversy, even if the issue is regarded as one of 'law'."

*Id.* (quoting Restatement (Second) of Judgments § 28 comment b (1982); ellipsis original; footnote omitted). Here, where the legal issue is identical and the factual settings so closely related, the exception simply does not apply. *Cf. id.* at 172, 104 S.Ct. at 579 ("Any factual differences between the two cases, such as the difference in the location of the plants and the difference in the private contracting firms involved, are of no legal significance whatever in resolving the issue presented in both cases.").

The ALJ further found, again citing detailed evidentiary support, that LPNs "provide only routine direction to the CNAs and do not responsibly direct the work of the CNAs." *Id.* at 35. Given these findings and the record evidence supporting them, the ALJ reasonably determined, and the Board reasonably affirmed the determination, that what authority the LPNs exercised was "of a merely routine or clerical nature" and did not "require[ ] the use of independent judgment" so as to make them statutory supervisors.[3]

### E. HMO Coverage

■ Fifth, Beverly challenges the Board's finding that it committed a ULP when it unilaterally implemented HMO coverage in place of the Union Health and Welfare Fund (Union plan) previously offered at five facilities. We again uphold the Board's finding.

The collective bargaining agreements required Beverly to provide employees with alternative health plans: Beverly's own and an HMO. Because no satisfactory HMO was available at five sites, the parties reached a grievance settlement agreement requiring that the Union plan be available for one year, until November 30, 1995, as an alternative at the five sites. On November 28, 1995 the Union received a letter from Beverly announcing that as of January 1, 1996 specific HMOs would replace the Union plan at the five sites. The Union responded in a letter dated December 5, 1996 with a "demand" that

Beverly "bargain in good faith over these issues." JA 295. In a December 8, 1996 letter, which Beverly describes as a response to the December 5 letter, Pet'r's Br. at 45–46 (although the letter purports to be in response to a December 6 letter and does not mention health plans), Senior Regional Director Chapman complained that the Union was continuing to "bypass the facilities' negotiators, and the facility administrators." JA 158. In a letter dated December 11 (expressly "in response to [the Union's] letter of December 5"), Beverly asserted the change in coverage did not "violate[ ] any contractual obligation or labor law." JA 296. Beverly subsequently implemented the change.

The ALJ found that Beverly "promptly rejected the request and proceeded to implement the replacement HMO plan on January [sic]." NLRB Dec. at 22. The ALJ further found this was a ULP because, although Beverly "had a right to terminate the [Union] plan on November 30, 1995," pursuant to the settlement agreement, it was "not free thereafter unilaterally to implement a replacement plan in the face of a timely union request for bargaining on the matter." *Id.* at 21 (citing *Carpenter Sprinkler Corp.,* 238 N.L.R.B. 974, 1978 WL 8124 (1978), *enforced in relevant part,* 605 F.2d 60 (2d Cir.1979)). Beverly challenges the ALJ's ULP finding on the sole ground that the evidence does not support the ALJ's finding that Beverly rejected the Union's December 5 bargaining demand. The ALJ's

---

**3.** At the time of the ALJ's decision the Board endorsed an "independent judgment" test that excluded "ordinary professional or technical judgment in directing less-skilled employees to deliver services in accordance with employer-specified standards." *See NLRB v. Kentucky River Cmty. Care,* 532 U.S. 706, 724, 121 S.Ct. 1861, 1873, 149 L.Ed.2d 939 (2001). In *Kentucky River* the United States Supreme Court expressly rejected the Board's test, concluding it "insert[ed] a startling cate-

gorical exclusion into statutory text that does not suggest its existence." *Id.* at 714, 121 S.Ct. at 1867. In affirming the ALJ's determination below, the Board properly considered *Kentucky River* and concluded that, under the Supreme Court's interpretation of the statutory terms, the ALJ's "extended fact-findings" supported his conclusion that the LPNs "exercised only 'routine' authority that did not require the use of independent judgment." NLRB Dec. at 1–2 n. 3.

finding to the contrary, however, is a fair inference from Chapman's December 11 letter, which maintained Beverly was free to unilaterally implement the coverage change despite the Union's bargaining demand, and from Beverly's subsequent implementation of the change.

### F. Videotaping

■ Sixth, Beverly challenges the Board's determination that it committed a ULP when it videotaped leafleting picketers outside Beverly's Fayette facility. The ALJ provided the following account of the episode:

> Early in the afternoon of Sunday, March 31, and just prior to the strike, about 18 employees participated in leafleting on a road leading up to the Fayette facility. While doing so, two security guards approached the group. One of them told Union Organizer Tammy Miller that Administrator Jim Filippone wanted the group to move down the road because they were on facility property. As he did this, the other guard stood nearby busily engaged in videotaping the group. When Miller replied that they had a right to be there according to township records, the guards left to report back to Filippone. Later that day, Filippone, after obtaining clarification from township officials, told the employees that they need not move.

NLRB Dec. at 26. The ALJ concluded the videotaping was a ULP because:

> Photographing employees engaged in lawful picketing tends to intimidate by implanting fear of future reprisals and is deemed surveillance violative of Section 8(a)(1), absent some legitimate justification. *Athens Disposal Co.*, 315 NLRB 87, 1994 WL 543134 (1994); *Waco, Inc.*, 273 NLRB 746, 747, 1984 WL 37122 (1984). None is shown here. Accordingly, I find a violation.

*Id.* Beverly acknowledges that such videotaping is generally unlawful but argues it offered a legitimate justification which the ALJ arbitrarily ignored. We agree.

The ALJ's own description of the events contradicts his assertion that Beverly offered no justification. His account, as well as Fillipone's hearing testimony, manifests that Fillipone first ordered the picketers to depart because he believed they were trespassing on Beverly's property, a justification that has been recognized by the Board. *See Ordman's Park & Shop*, 292 N.L.R.B. 953, 956, 1989 WL 223844 (1989) ("It is undisputed that during the course of the picketing Respondents took photographs of nonemployee [sic], paid pickets in order to preserve evidence of alleged trespass. The Board has held that where photographs are taken for the purpose of gathering evidence, and there is no showing of coercion of the employees, such photographing is not unlawful." *Roadway Express*, 271 N.L.R.B. 1238, 1984 WL 36734 (1984)). When Fillipone got a "clarification from the township" that the leafleting site was subject to township control under an easement, he testified at the hearing, he immediately dropped his opposition to the picketers' presence. JA 1247. Faced with Beverly's explanation, the ALJ should have made a determination, supported by factual findings, whether it was a "legitimate justification" under Board precedent. *See Timken Co.*, 331 N.L.R.B. No. 86 (Jul. 13, 2000); 2000 WL 981649, *21 ("The test of validity of such conduct is whether there was proper justification and whether it reasonably tends to coerce employees.") (citing *F. W. Woolworth Co.*, 310 N.L.R.B. 1197, 1204, 1993 WL 135443 (1993); *Athens Disposal Co.*, 315 N.L.R.B. 87, 98, 1994 WL 543134 (1994); *Dayton Hudson Corp.*, 316 N.L.R.B. 477, 1995 WL 79276 (1995); *Parsippany Hotel Management Co.*, 319 N.L.R.B. 114, 1995 WL 579213 (1995)). Instead he ignored it.

## G. Advertising for Replacement Workers

■ Seventh, Beverly challenges the Board's finding that it committed a ULP when, after receiving the strike notice, it advertised for replacements to work at its Grandview facility at higher rates of pay than it had been paying its union employees. We uphold the Board's finding.

Beverly argues that under Board precedent it is free to set the terms and conditions of employment for striker replacements. The Board acknowledged this general right but observed in its decision that an employer "may not exercise that right in a manner designed to undermine the Union" and concluded that here, "in the context of" Beverly's other "unfair labor practices before and shortly after it placed the ads, including unilateral actions that disparaged the Local Union's representative role and discriminatory treatment of two Grandview Manor union activists," and "given the Respondent's corporatewide and centralized policy of hostility to its employees' rights under the Act,"[4] "the unexplained and publicized offer of higher wages to strike replacements can only be seen as designed further to undermine the Local Union in the eyes of the employees it represented." NLRB Dec. at 4. The Board's determination that advertising higher pay rates for replacement workers can constitute an unfair labor practice under certain circumstances is supported by its precedent. See Service Elec. Co., 281 N.L.R.B. 633, 639 n. 11, 1986 WL 54372 (1986) (acknowledging that "the ability to set employment terms for replacements is a necessary incident of the underlying right to hire replacements" but noting that "if the struck employer is exercising that right in a manner designed to accomplish an illegal objective, i.e., to undermine the bargaining representative, then there

would be a basis for finding a violation"); Workroom for Designers, 274 N.L.R.B. 840, 856, 1985 WL 45854 (1985) ("[T]o advertise a willingness to pay nonstriking employees more than the employer had paid the strikers clearly has a tendency to interfere with, restrain, and coerce employees in the exercise of their statutory rights, in violation of Section 8(a)(1) of the Act."). In light of the circumstances cited by the Board and Beverly's failure below to offer a lawful justification for the higher wages, the Board's finding of unlawful motive was not arbitrary or capricious.

## H. Corporate–Wide Remedy

Finally, Beverly challenges the corporate-wide scope of the remedial order, asserting that, at most, it should apply only to Beverly's facilities in Pennsylvania, where all of the ULPs here occurred. We conclude that the broad, company-wide remedy is adequately supported and is therefore entitled to enforcement.

■ "To offset companywide effects caused by extensive unlawful conduct, courts and the Board have expanded remedial measures beyond the actual locations at which unfair labor practices were found. In certain cases, remedies designed to facilitate union communication and dissipate harmful effects have been applied companywide." United Steelworkers of Am. v. NLRB, 646 F.2d 616, 635–36 (D.C.Cir. 1981). "Factors that are helpful in deciding whether an order is too broad include (1) the number of violations as compared to the number of unaffected parties and facilities, (2) the types of violations, (3) the corporate control over, or causation of, the unfair labor practices, and (4) the publicity of the unfair labor practices among the employees." Beverly Cal. Corp. v. NLRB, 227 F.3d 817, 846 (7th Cir.2000) (citing

4. See infra Part II(H).

*Torrington Extend–A–Care Employee Ass'n v. NLRB,* 17 F.3d 580, 586 (2d Cir. 1994); *Blount Brothers Corp. v. NLRB,* 571 F.2d 4, 4–5 (7th Cir.1978)). The Board below ordered a corporatewide remedy based on (1) Beverly's geographically-broad history of widespread ULPs, *see Beverly Cal. Corp.,* 326 N.L.R.B. 232, 1998 WL 541939 (1998), *enforced in part, vacated in part and remanded,* 227 F.3d 817 (7th Cir.2000); *Beverly Cal. Corp.,* 326 N.L.R.B. 153, 1998 WL 1112576 (1998), *enforced,* 227 F.3d 817 (7th Cir.2000); *Beverly Enters.,* 310 N.L.R.B. 222, 1993 WL 26826 (1993), *enforced in part and denied in part, Torrington Extend–A–Care Employee Ass'n v. NLRB,* 17 F.3d 580 (2d Cir.1994); (2) the direct involvement here of both corporate and regional management;[5] and (3) Beverly's centralized structure for dealing with labor issues. These factors are supported by the evidence which reveals that Beverly's Labor and Employment Vice President Donald Dotson kept close oversight of all regional labor developments (and in fact made the decision to deny the Union access to Beverly's facilities) and that regional officers, in particular Chapman, were extensively involved in the ULPs at issue. The Seventh Circuit found that "the fact that most strongly supports the Board's chosen remedy" is "the ubiquitous nature of the area personnel at local facilities whenever labor problems arose"—"[i]n case after case, at facility after facility, the Board saw regional managers coming in to ensure that Bev-

erly's overall corporate policy was implemented." *Beverly Cal. Corp. v. NLRB,* 227 F.3d at 847.[6] The same holds true here.

For the reasons set forth above, the petition for review is granted and the cross-application for enforcement is denied as to the ULP findings based on the refusal to rehire striking employees—given that the strike notice was inadequate—and on the videotaping of picketing employees. In all other respects the petition is denied and the cross-application is granted.

*So ordered.*

---

**5.** The Board asserted: "High-ranking corporate and regional officials who played prominent roles in directing, approving, or knowingly failing to prevent unlawful actions included Beverly President Bill Mathies; Vice President for Labor and Employment Donald Dotson; Region 1 (Northeast) Vice President of Operations Claude Lee; Region 1 Director for Associate Relations Wayne Chapman; and Region 1 Labor Relations Manager Ron St. Cyr." NLRB Dec. at 5.

**6.** We note that, by fashioning separate Pennsylvania and corporate postings, the Board adequately addressed the Seventh Circuit's concern, regarding the order that circuit confronted, "that much of it is nothing more than a laundry list of the particular violations committed at individual facilities" and its direction to the Board on remand "to go through the order in the first instance and decide which parts are properly directed to the corporation as a whole and which to particular facilities." 227 F.3d at 847.