# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3306

_____

| | | |
|---|---|---|
| Minnesota Licensed Practical Nurses Association, | * | |
| | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | |
| | * | Petition for Review of an Order of |
| National Labor Relations Board, | * | the National Labor Relations Board. |
| | * | |
| Respondent, | * | |
| | * | |
| Alexandria Clinic, P.A., | * | |
| | * | |
| Intervenor on Appeal. | * | |

_____

Submitted: October 21, 2004
Filed: May 11, 2005

_____

Before LOKEN, Chief Judge, MAGILL and BENTON, Circuit Judges.

_____

LOKEN, Chief Judge.

The Minnesota Licensed Practical Nurses Association ("the Union") petitions for review of a National Labor Relations Board decision overruling Board precedent and holding that the Union violated Section 8(g) of the National Labor Relations Act, 29 U.S.C. § 158(g), by unilaterally delaying the commencement of a strike beyond the time disclosed in the ten-day notice mandated by § 8(g). As a result of this ruling,

twenty two striking nurses lost their status as protected employees, and their health care employer did not violate the Act by terminating them. Like two other circuits, we agree with the Board's new interpretation of the plain meaning of § 8(g). Accordingly, we deny the petition for review.

The Union is the certified collective bargaining representative of nurses employed by the Alexandria Clinic, a health care organization serving a large area in west-central Minnesota. In August 1989, after months of unsuccessful bargaining, the Clinic announced that it would implement its final offer. In response, the nurses voted to strike. The Union gave the ten days' written notice required by § 8(g), advising the Clinic that the strike would commence at 8:00 a.m. on September 10, 1999. However, the Union secretly advised the nurses that they could delay the commencement of the strike up to 72 hours.[1] The Clinic posted a notice that it would remain open and continue patient care despite the strike. The strike leaders decided that the bargaining unit nurses should report for duty on September 10 and walk off the job at noon. They did not notify the Clinic of this plan.

On the morning of September 10, temporary replacement nurses hired by the Clinic reported before 8:00. Fourteen bargaining unit nurses also reported for duty without warning. The Clinic responded by having the replacements wait in a lounge area so as not to disturb the patients. The bargaining unit nurses left just before noon, again without warning the Clinic or their supervising physicians. Eight other nurses not on duty that morning later joined the strike. Patient care was not affected, as the replacement nurses were present to take over at noon on September 10. Citing the strike delay without notice, the Clinic fired the striking nurses for engaging in unlawful activity. After a hearing, the Administrative Law Judge held that the Union

---

[1]An e-mail from the Union advisor to the nurses explained: "we can go at 8:00 [on Friday, September 10]; or just have everyone go to lunch and not come back; or work as usual on Friday, but not show up for Urgent Care Saturday -- and have them wondering about Monday (when no one will come to work)!"

did not violate § 8(g) and therefore the Clinic committed an unfair labor practice by discharging the nurses. A divided Board reversed. Alexandria Clinic, 339 NLRB No. 162 (2003).

Congress enacted § 8(g) in 1974, when it extended the Act to cover non-profit health care facilities, "to give the health care institutions sufficient advance notice of a strike or picketing to permit timely arrangements for continuity of patient care." 339 NLRB No. 162 at 3. Section 8(g) provides in relevant part:

> A labor organization before engaging in any strike . . . at any health care institution shall, not less than ten days prior to such action, notify the institution in writing . . . . The notice shall state the date and time that such action will commence. The notice, once given, may be extended by the written agreement of both parties.

In Greater New Orleans Artificial Kidney Center, 240 NLRB 432, 435-36 (1979), the Board held that a union does not violate § 8(g) by unilaterally delaying the start of a strike "between 12 and 72 hours . . . where there is at least 12 hours advance notice given to the employer of the postponement." In rejecting a contrary "restrictive" interpretation of § 8(g), the Board relied on legislative history, not the plain meaning of the statute. The Senate report to the 1974 amendments stated:

> It is not the intention of the Committee that a labor organization shall be required to commence a strike or picketing at the precise time specified in the notice; on the other hand, it would be inconsistent with the Committee's intent if a labor organization failed to act within a reasonable time after the time specified in the notice. Thus, it would be unreasonable, in the Committee's judgment, if a strike or picketing commenced more than 72 hours after the time specified in the notice. In addition . . . if a labor organization does not strike at the time specified in the notice, at least 12 hours notice should be given of the actual time for commencement of the action.

S. REP. NO. 93-766 at 4 (1974), reprinted in 1974 U.S.C.C.A.N. 3946, 3949.

Though not previously questioned by the Board, the rule adopted in Greater New Orleans was rejected by the two circuits that have considered it. In NLRB v. Washington Heights-West Harlem-Inwood Mental Health Council, Inc., 897 F.2d 1238, 1247 (2d Cir. 1990), the court denied enforcement of an unfair labor practice order because the union had violated § 8(g); the court declined to rely on legislative history "to depart from the straightforward unambiguous language of the statute requiring the Union to specify in writing the date and time it would strike." In Beverly Health & Rehab. Servs., Inc. v. NLRB, 317 F.3d 316, 321 (D.C. Cir. 2003), the court refused to enforce an unfair labor practice order because the union violated § 8(g) by unilaterally delaying the strike three days, expressly rejecting the Board's reliance on Greater New Orleans:

> The meaning of [§ 8(g)'s] mandatory language could not be plainer or the Congress's intent in enacting it clearer. The notice must provide ten days notice of a strike specifying the day and time it is to occur. . . . Although the [union's first notice] provided adequate notice of a strike to commence on April 29, as it turned out the strike did not begin until three days after that date; the extension [notice], on the other hand, accurately identified the date of the strike but did not afford the requisite ten days' notice. . . .
>
> . . . If the Congress had intended to allow either party to extend the notice unilaterally, it could easily have said so -- but it did not. Instead, the Congress carved out but a single express exception -- when both parties consent in writing -- an exception that would be unnecessary if either party could unilaterally extend the notice at will.

In this case, the Board concluded that the Union violated § 8(g) and therefore the Clinic did not commit an unfair labor practice for two reasons. First, the Union did not satisfy the "substantial compliance" requirements of Greater New Orleans because it did not give the Clinic at least twelve hours notice of when the delayed strike would begin. Second, ruling more broadly, the Board majority expressly overruled Greater New Orleans and joined the Second Circuit and the D.C. Circuit in holding that the plain language of § 8(g) bars a union from unilaterally extending

-4-

the date and time of the strike as disclosed in the union's ten-day notice. "In our view," the Board explained, "by relying on the legislative history to find that unilateral extensions of strike notices were permissible, the Board in Greater New Orleans effectively rewrote the third sentence of Section 8(g) to make its requirements discretionary rather than mandatory." 339 NLRB No. 162 at 4.[2] That alternative holding is the focus of the Union's appeal.

1. The Union first argues that the Board's new interpretation of § 8(g) is contrary to congressional intent as reflected in the legislative history on which Greater New Orleans relied. The general rule is clear: "If a statute's meaning is plain, the Board and reviewing courts 'must give effect to the unambiguously expressed intent of Congress.'" Holly Farms Corp. v. NLRB, 517 U.S. 392, 398 (1996), quoting Chevron U.S.A. v. Natural Res. Def. Council, 467 U.S. 837, 843 (1984). But as the 5-4 decision in Holly Farms illustrates, determining the plain meaning of a provision in the federal labor laws can be a dicey task. Like the Board majority, we are inclined to agree with the Second Circuit and the D.C. Circuit that § 8(g) unambiguously precludes unilateral extensions of the commencement of a strike. The last sentence provides that "notice, once given, may be extended by the written agreement of both parties." As the D.C. Circuit explained in Beverly, 317 F.3d at 321, "Instead [of allowing unilateral extensions] the Congress carved out but a single express exception . . . . This is a case where the canons of avoiding surplusage and *expressio unius* are at their zenith because they apply in tandem."

On the other hand, the contemporaneous legislative committee reports are strong evidence that at least the principal sponsors of § 8(g) intended the Board to

---

[2]The Board majority declined to consider two issues as not presented by the facts of this case -- whether a *de minimis* delay in the start of a strike would violate § 8(g), and whether "the traditional doctrine of equitable estoppel" might apply where the strike was postponed by an unanticipated emergency and the employer "unreasonably declined to grant an extension." Alexandria Clinic, 339 NLRB No. 162 at 6 n.17. We likewise do not consider these issues because we agree with the Board that the disruptive four-hour delay in this case was not *de minimis*.

apply a reasonableness standard to the question at hand; the Senate report even suggested the specific 12 hour-72 hour rule adopted in Greater New Orleans. The Supreme Court has given less emphasis to legislative history in recent years, recognizing that it is frequently an unreliable indicator of congressional intent. But only Justice Scalia has consistently objected to "the recent practice of relying upon legislative material to provide an authoritative interpretation of a statutory text." Wisconsin Pub. Intervenor v. Mortier, 501 U.S. 597, 622 (1991) (Scalia, J., concurring). Responding for the other eight Justices in Mortier, Justice White refused to disregard legislative history altogether, acknowledging only that "a committee of Congress cannot take language that could only cover 'flies' or 'mosquitoes,' and tell the courts that it really covers 'ducks.'" Id. at 611 n.4.

Even if this legislative history casts doubt on the Board's interpretation of § 8(g)'s plain meaning, the Union's statutory argument does not prevail. "[I]f the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." Chevron, 467 U.S. at 843. The Supreme Court "will uphold a Board rule as long as it is rational and consistent with the Act . . . . even if it represents a departure from the Board's prior policy." NLRB v. Curtin Matheson Scientific, Inc., 494 U.S. 775, 787 (1990); see Rust v. Sullivan, 500 U.S. 173, 186-87 (1991). Here, the Board bolstered its analysis of the statute's plain meaning by explaining that its new interpretation of § 8(g) effectuates the policy underlying the statute -- to protect patient health care -- and eliminates "the kind of needless uncertainty and concomitant litigation generated [by] the imprecise and ambiguous 'substantial compliance' standard of Greater New Orleans." Alexandria Clinic, 339 NLRB No. 162 at 5. We uphold the Board's construction of § 8(g).

2. The Union next argues that, even if the Union violated § 8(g) by unilaterally extending the time to strike without notice to the Clinic, the individual nurses did not lose their protected status. The Union reasons that § 8(d) of the Act only denies protected status to an employee who strikes "within the appropriate period specified

in subsection (g)," the "period specified" in § 8(g) is the ten days after notice is given, so § 8(d) applies only to unlawful strikes *prior to* the date and time contained in the § 8(g) notice, not strikes that commence *after* that time. If the twenty two nurses did not lose their protected status, the argument concludes, the Clinic committed an unfair labor practice by discharging them for engaging in an economic strike.

The Board rejected this contention:

> As made clear in Section 8(g), the "appropriate period" is the waiting period after a notice that gives the date and time for a strike. Obviously, if there is no notice, there can be no lawful strike. Concededly, in the instant case, there was a notice and the employees did not strike within the period set by the notice. However, the employees did strike thereafter, *and there was no notice with respect to that strike. . . .* In sum, the strike was without notice, and it was therefore unlawful.
>
> * * * * *
>
> . . . [T]his conclusion results in the nurses losing their protected employee status under Section 8(d) for engaging in an unlawful strike, and subjects them to lawful discharge.

Alexandria Clinic, 339 NLRB No. 162 at 6 (emphasis in original). Assuming § 8(d) is silent or ambiguous on this issue, the Board has reasonably construed the statute. Indeed, the Union's interpretation would immunize the striking nurses from the consequences of their unlawful activity, contrary to the Board's obligation to enforce compliance with the Act. See Fort Smith Chair Co., 143 NLRB 514, 518 (1963).

3. Finally, the Union argues that it would be manifestly unjust to apply the Board's new interpretation of § 8(g) retroactively because the Union and the nurses justifiably relied on the Board's decision in Greater New Orleans in deciding to delay their strike by four hours. In the last fifty years, retroactivity has become a complex subject. See generally Linkletter v. Walker, 381 U.S. 618 (1965). In considering this issue, we note first that the Board ruled on an unfair labor practice charge, which is

an adjudicatory not a rule-making function. The Board does not abuse its substantial discretion in dealing with this and other § 8(g) disputes on a case-by-case basis. See SEC v. Chenery Corp., 332 U.S. 194, 202-03 (1947). Adjudication is a "form of administrative action where retroactivity is not only permissible but standard." Bowen v. Georgetown Univ. Hosp., 488 U.S. 204, 221 (1988) (Scalia, J., concurring).

When the Board announces a new rule in one case and then applies that rule retroactively in another case, the result resembles the adoption and application of quasi-legislative agency rules, a process that was subjected to retroactivity limitations in Bowen. For this reason, this court and others have considered whether retroactive application of a new rule to other pending cases would be manifestly unjust, examining whether the losing party relied on established Board policy, whether the Board abruptly changed that policy, and the severity of the penalty imposed on the losing party. See Ryan Heating Co. v. NLRB, 942 F.2d 1287, 1289 (8th Cir. 1991); Retail, Wholesale & Dep't Store Union v. NLRB, 466 F.2d 380, 390-91 (D.C. Cir. 1972). But in this case, the Union objects to the retroactive application of a new rule *in the very case in which the rule is adopted*. We know of no case in which a circuit court has precluded the Board from applying a new rule of decision to the parties to the dispute being adjudicated. Moreover, the case was filed by the Board's general counsel seeking back pay for the discharged nurses -- in effect, a damage remedy. The employer defended, arguing that the nurses engaged in unlawful strike activity which justified their discharge. That defense prevailed. To nonetheless award the nurses damages because they relied in good faith on "bad law" would be extraordinary. Adoption of such a principle might well have an unfortunate impact on the incentive of other parties and their attorneys "to advance contentions requiring a change in the law." Stovall v. Denno, 388 U.S. 293, 301 (1967).

Assuming without deciding that the standard set forth in Ryan Heating applies to the case in which a new rule is adopted, we have no difficulty concluding that the Union has failed to satisfy that standard. The reliance issue would be more difficult if the strike had been delayed 12 to 72 hours and the Union had given at least twelve

hours written notice of the delay, the unilateral extension upheld in <u>Greater New Orleans</u>. Instead, the Union delayed the strike a disruptive one-half day with no notice of the delay. Prior to this case, the Board had never upheld this tactic. <u>See Operating Engineers Local No. 3 (Washoe Medical Center)</u>, Case No. 32-CG-47, NLRB General Counsel Advice Mem. (Feb. 5, 2001) ("the Board has not yet developed rules concerning delays of less than 12 hours"). And in this case, the Board held as an alternative ground that the Union's four-hour delay without notice did *not* satisfy the "substantial compliance" requirements of <u>Greater New Orleans</u>. <u>Alexandria Clinic</u>, 339 N.L.R.B. No. 162, at 2, 7. Thus, the nurses and the Union did not rely on established Board policy, and the Board's decision to apply its new interpretation of § 8(g) in this case was not manifestly unjust. <u>See Cedar Valley Corp. v. NLRB</u>, 977 F.2d 1211, 1221 (8th Cir. 1992).

The nurses engaged in a strike in violation of § 8(g), thereby lost their protected status by reason of § 8(d), and were lawfully discharged by their employer. The individual nurses may have acted in good faith in relying upon unsound advice from the Union and its legal counsel. But that does not justify rewarding their unlawful activity by imposing a back pay and reinstatement remedy on their employer, whose conduct was entirely lawful. The petition for review is denied.

_____